THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RANDY ROY McCOLLUM, Defendant-Appellant.

Third District   No. 3—91—0314

Opinion filed December 4, 1992.

Peter A. Carusona, of State Appellate Defender's Office, of Ottawa, for
appellant.

Samuel Naylor VI, State's Attorney, of Carthage (John X. Breslin and
Jay P. Hoffmann, both of State's Attorneys Appellate Prosecutor's Office,
of counsel), for the People.

JUSTICE HAASE delivered the opinion of the court:

A jury found the defendant, Randy Roy McCollum, guilty of mur-
der (Ill. Rev. Stat. 1991, ch. 38, par. 9—1). He was thereafter sen-
tenced to 60 years of imprisonment. He appeals. We reverse the con-
viction and remand the cause for a new trial.

The record shows that the body of the victim, Lloyd Mecum, was found inside his home at 8:30 a.m. on July 25, 1990. An autopsy revealed that his death was caused by a stab wound to the lung. The time of death could not be determined. However, the evidence established that the victim was alive at 9:30 p.m. on July 24. Pictures of the crime scene showed that the victim bled profusely.

A neighbor of the victim, Audine Jung, testified that on July 25 at about 1:45 a.m. she noticed a car in her driveway. She did not see either a person or any dogs in the car. After viewing pictures of the defendant's Mustang and a blue station wagon, she at one time identified the defendant's car as being the one outside her home, and on another occasion identified the station wagon as the car in question.

Jeffrey Bower, a farmer, testified that on July 25 at about 2:30 a.m. he was awakened by the defendant, who had run out of gas. State Trooper Gregory Rapp testified that he also observed the defendant at Bower's home. He noted that the defendant was wearing a black, sleeveless T-shirt, dirty blue jeans, and dirty tennis shoes. He did not observe any blood on the defendant. However, he did smell a sweet pungent odor on the defendant, which, after talking to an evidence technician, he identified as resembling the smell of blood. He noticed that the defendant had a couple of dogs in the car with him.

It was determined that the distance between the victim's home and the Bower residence was about 30 miles, and that under normal driving conditions, it would take about 35 to 40 minutes to make the drive.

The defendant presented testimony showing that Mecum had been the victim of several recent thefts at his gas station. The thief apparently had a key since there had been no forced entries. Other evidence showed that Mecum rented David Sutton the back of his station to do mechanical work, and that Sutton had a key to the station. The defendant was an employee of Sutton at the victim's gas station. During the rental period there had been a problem with missing tools and money. Finally, the evidence showed that Sutton was behind in his rent to Mecum and that eviction papers had been served on him.

The State presented into evidence a copy of the defendant's signed confession to the murder. The confession was not taped, nor were any notes taken by the police officers conducting the interview. In addition, no police report concerning the interview was made until several days after the interview.

In the confession, the defendant stated he went to Mecum's trailer to steal some money. He entered the trailer and started searching it. At that point, Mecum grabbed him from behind. Following a

scuffle, the defendant grabbed a knife from the kitchen counter and stabbed Mecum. He then took a money bag and left the trailer. As he drove away, he threw his gloves, a flashlight, the money bag, and the knife into a road ditch.

Other evidence showed that the only item ever found in the ditch was one glove, which had a spot of blood on it. The blood was identified as human but it could not be typed. A second glove was found in the defendant's car. It also had a small bloodstain on it that could have come from the victim but not the defendant. It was also shown that the stain could have come from 40% to 42% of the population.

At his trial, the defendant testified that he was coerced into signing the confession which had been written by Sheriff Yager. He stated he only signed it because the police threatened to arrest his wife as an accessory. Since his wife was pregnant, he was worried about the effect this would have on her and the baby. He also stated that the police refused his request for an attorney to be present.

The defendant also testified regarding his activities on the day of the murder. He stated that sometime after about 10:30 p.m., he went to get his dogs. After picking them up, he decided to go to Camp Point so the dogs could swim in a pond. On the way back home he ran out of gas. After waiting 10 to 15 minutes, he woke up a farmer and got gas. He then went home.

Regarding the physical evidence in the case, Officer John Jefferson testified that he took photographs of tire impressions he found by Jung's garage. There were two separate sets of tire tracks, one wide and the other narrow. Although he had no training in tire-print identification, he opined that the wider tracks appeared to have the same tread design as the tires on the defendant's car. Officer William Ferrill's testimony regarding this evidence was substantially the same as Jefferson's.

Police officer Larry Hood, who was trained in tire-track identification, testified that when he observed the crime scene he did not see any tread impressions, although he did see tire imprints. However, he could see tire impressions in the photographs taken by Officer Jefferson and noted that the time of day could make a difference in the ability to observe specific tread impressions. He did not give an opinion regarding whether the pictures of the tread matched, or were even similar to, the tread on the defendant's tires.

No blood was found on any of the clothing the defendant was wearing on the night of the murder. Tests on a reddish substance found on the right exterior chrome door handle of the defendant's car indicated that it was not blood. Testing on a substance found on the

right interior door handle indicated it was blood, but it could not be determined if it was human.

Finally, the evidence showed that no blood was found behind the seat in the defendant's car. In addition, no money bag or knife was found in the area where the glove was found, even though a road improvement project was conducted on that stretch of the highway and both shoulders of the road were walked by the project engineer.

On appeal, the defendant first argues that his sixth amendment right to confrontation was violated. Specifically, he contends that the trial court erred when it refused to allow him to question State witnesses regarding their refusal to be interviewed by a defense investigator.

Although a witness has a right to refuse to cooperate with or to be interviewed by the other side, that refusal can be shown in court to demonstrate bias, hostility, prejudice, or interest in the outcome. As such, the refusal to talk to the other side in advance of the trial is a proper matter to bring out on cross-examination. *People v. Atteberry* (1991), 213 Ill. App. 3d 851, 572 N.E.2d 434; see also *People v. Timmons* (1983), 114 Ill. App. 3d 861, 449 N.E.2d 1366; *People v. VanZile* (1977), 48 Ill. App. 3d 972, 363 N.E.2d 429.

In the case at hand, the record shows that the defendant attempted to cross-examine a State witness regarding his pretrial refusal to talk to a defense investigator. The State objected to the relevancy of this line of questioning, and a hearing was held outside of the jury's presence. When the trial court stated that it would sustain the State's objection, the defendant gave an offer of proof.

According to defense counsel, defense investigator Gary Nelson attempted to talk to Deputy Scheuermann about the location of the glove found in a ditch. Counsel stated that Sheriff Yager told Nelson that Scheuermann had no intention of talking to Nelson without being subpoenaed. Defense counsel argued to the trial court that Scheuermann's statement to Yager was relevant to the prejudice and bias of the witness.

Following this hearing, the trial court concluded that the issue boiled down to whether a witness' refusal to talk to the defense was indicative of bias or prejudice. It apparently found that it was not, and, as such, sustained the State's objection.

Following *Atteberry*, we conclude that this was error. The defendant should have been allowed to question Scheuermann and Yager regarding Scheuermann's refusal to cooperate with Nelson. The court's failure to allow this line of questioning deprived the defendant of the right to show a witness' potential bias or prejudice.

We note that the State argues that the above-mentioned case law is incorrect, and that the proper law to be followed is set forth in *People v. Peter* (1973), 55 Ill. 2d 443, 303 N.E.2d 398. We disagree. First, we conclude that the issue presented in this case was not addressed in *Peter*. In addition, we note that this same contention was raised and rejected in this court's opinion of *People v. Timmons* (1983), 114 Ill. App. 3d 861, 449 N.E.2d 1366.

The defendant's final contention on appeal is that he was denied a fair trial by the prosecutor's numerous prejudicial comments in final argument. Specifically, the defendant claims that the prosecutor made misstatements about the tire-impression evidence and Audine Jung's trial testimony; made misstatements concerning the bloodstain evidence; made misstatements regarding the defendant's testimony; improperly asked the jury to judge the credibility of a witness based upon its knowledge from reading local newspapers; improperly appealed to the jurors' passions by repeatedly stating that the blood sample from the victim came from the victim's heart; appealed to the jurors' prejudices to support the "local boys"* and improperly aligned himself with the sheriff's department; implied that the defendant's prior convictions showed that he was a bad person; and improperly expressed, on a number of occasions, his own personal belief that the State's witnesses were credible.

The defendant also set forth a number of other statements made by the prosecutor that he contends were improper. We do not need to list the remaining complaints due to our disposition of this case.

Initially, we note that, with one exception, the defendant did not object to the remarks that he now complains of on appeal. He has thereby waived any error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Accordingly, we will only reverse if there was plain error, which is defined as error that either denies the defendant a fair trial or that occurs in a case where the evidence is closely balanced. *People v. Morgan* (1991), 142 Ill. 2d 410, 568 N.E.2d 755.

The State argues that some of the statements made by the prosecutor were proper comments based on the evidence presented, and that, in any event, all the comments were harmless since the evidence of the defendant's guilt was overwhelming. We find that the errors were not harmless. The exceptionally high number of improper comments forces us to conclude that the defendant was denied a fair trial. While most of the comments, viewed separately, would not cause us to find reversible error, the totality of the comments do.

For the purpose of this opinion we will address five of the errors we find to be the most egregious.

It is well established that a prosecutor has great latitude in making closing arguments and, absent a clear abuse of discretion, the trial court's determination as to the propriety of the comments will not be disturbed. (*People v. Barkauskas* (1986), 147 Ill. App. 3d 360, 497 N.E.2d 1183.) However, a basic principle of our criminal justice system is that the prosecutor owes the defendant a duty of fairness throughout the trial, including his closing argument. The prosecutor, thus, has an ethical obligation to delete prejudicial and improper matters from his closing argument, and the failure to do so constitutes a breach of that duty. *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734.

A prosecutor must confine his arguments to the evidence and reasonable inferences that can be based on it. (*People v. Linscott* (1991), 142 Ill. 2d 22, 566 N.E.2d 1355.) In addition, a prosecutor is prohibited from making comments which are calculated solely to arouse the prejudice and inflame the passions of the jury. *People v. Threadgill* (1988), 166 Ill. App. 3d 643, 520 N.E.2d 86.

Here, the defendant contends that the prosecutor misstated evidence regarding the tire-tread testimony of Officers Hood, Jefferson, and Ferrill. In his closing statement, the prosecutor stated:

"Deputy Jefferson, straight, straight out testimony, no doubt. He saw those tire prints in midday. He saw them in the evening with Bill Ferrill.

He went over there in the sunlight and looked at those, those treads on the tires of that Mustang, and they were the same. He didn't try to gild the lily. He said, 'I know that tire made that print.' But he said, 'I know that tire tread matches that print.' He knew that for certain; so did Bill Ferrill.

And the Defendant called their own expert to the stand in their case, Larry Hood, and he confirmed it in great detail. So there is no doubt about that. There was a definite match.

\* \* \*

And on cross examination [Officer Hood] said he could see the tire imprint even more clearly in the evening light than in the morning; because of the way the light hits, a little more moisture out there in the evening."

In rebuttal, the prosecutor stated:

"[Hood] also said the tire imprints matched. There were imprints. He said there was a disturbance in the gravel where a car had come in gently, but where, the one we're talking about, the tire prints that the Deputies matched, was when the car

made the abrupt departure from there; and that's what Hood testified about.

Sure, they brought these little black and white photos from way back in a distance and asked Hood if he had looked at the area, which he said, 'Yes,' and he found the disturbance in the gravel. But when I cross examined him, I brought out those color photographs of the tire imprints in the dust, not the gravel chips.

He identified it as the tires that came off that Mustang, and there is no amount of arguing through a lawyer to you to change that. You heard that evidence there."

■ The defendant argues, and we agree, that these statements misrepresented the evidence. Here, neither Ferrill nor Jefferson ever testified that the tire treads "matched," although they did say the treads resembled each other. More importantly, Hood never testified that he saw any tire-tread imprints at the scene. In addition, even after seeing the photographs of the tire tread, he did not say they matched the tread of the defendant's tires.

The next misstatement of the evidence was made by the prosecutor when, in his opening statement, he stated that "the evidence will show that there was some of the victim's blood on a glove in the back seat of the defendant's car." He went on in closing argument to say that Mike Brown, a forensic expert, testified that the blood found on the glove was that of the victim.

The record, however, reveals that Brown never said the blood was that of the victim. Instead, he stated that the blood could have come from the victim or anyone else with the PGM plus one blood factor, which included over 40% of the general population. We note that the State in its brief recognizes that these comments were probably improper.

The prosecutor also improperly appealed to the jurors' passions when he repeatedly commented on the fact that the blood sample from the victim came from the victim's heart.

"He [Kevin Zeeb] took the whole blood standards of the Defendant that we got the court order, and he got the blood that was taken out of the Lloyd Mecum's heart, out of Lloyd Mecum's heart at the autopsy. You heard the evidence about that.

Dr. Dietrich took it out of his heart, put it in the vial, the vacutainer. It stayed in there. The whole blood standard was used by Kevin Zeeb, and he made the stain cards that later Mike Brown used to analyze.

Maybe the Defendant killed Mecum so that he could, he would be eliminated as a witness against him; but somehow through the ability of the scientists to look at things closer than they could have two hundred years ago, in a way Mecum has spoken to us from his heart in this case."

These comments were clearly designed to inflame the jurors' passions, and they did nothing to advance the truth-seeking process.

In addition, the prosecutor appealed to the jurors' passions and prejudices when he stated, "But [the defense investigator] was, he [was] getting $35 an hour. You know, you know from your just living here knowing, reading the news and all that, deputies get six to eight dollars an hour. Look what they did in this case, and look what he did." Later on in his closing statement, the prosecutor not only mentioned the local police again, but also aligned himself with them. Specifically, he stated, "I guess us poor old country boys in Hancock County didn't do too bad."

We find these comments to be inflammatory since they improperly appealed to the jury's prejudice to support the local police. Such tactics have been found to be reversible error. See *People v. Threadgill* (1988), 166 Ill. App. 3d 643, 520 N.E.2d 86.

Finally, we note that the prosecutor improperly commented on the defendant's prior convictions. When discussing the convictions he stated, "He is the same old boy he was then." This was error, because the convictions had been admitted for the limited purpose of impeaching the defendant's credibility. As such, it was improper for the prosecutor to refer to them for any other purpose. See *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827.

In conclusion, we find that the above errors, combined with the trial court's failure to allow the defendant to cross-examine the State's witnesses regarding their refusal to talk with the defense prior to trial, denied the defendant his right to a fair trial.

Accordingly, the judgment of the circuit court of Hancock County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

BARRY, P.J., and STOUDER, J., concur.