THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON TRAMAINE WESLEY, Defendant-Appellant.

First District (5th Division)   No. 1—90—3210

Opinion filed July 30, 1993.—Rehearing denied September 2, 1993.

246

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Aaron Wesley (defendant) appeals the portion of the jury's verdict which found him guilty of one count of aggravated criminal sexual assault to the anus. Defendant also appeals his 14-year sentence.

The issues presented for review are: (1) whether defendant's venire was constitutionally composed; (2) whether the trial court properly exercised its discretion in evaluating whether there was reasonable assurance that the jurors were impartial; (3) whether the verdicts were legally inconsistent; (4) whether defendant was entitled to an instruction on battery as a lesser included offense of the offense of aggravated criminal sexual assault; (5) whether defendant was proven guilty beyond a reasonable doubt; (6) whether the trial court erred by rejecting several of defendant's evidentiary objections; and (7) whether the trial court abused its discretion by imposing a 14-year sentence on defendant.

We affirm.

BACKGROUND

In the early eve of July 8, 1989, LC's boyfriend (Baumann) left their apartment and, while outside, saw defendant and invited him to a birthday party. Baumann did not know defendant but had seen him at Baumann's apartment complex pool. Defendant went to the party with one of his friends. He was the only African-American present.

LC testified that she spent most of the evening sick in her bedroom because she was suffering from a long-standing ailment which caused her jaw to pop out of its joint. She later emerged from her

bedroom to sing "Happy Birthday." At approximately 11:30 p.m., she sat on a couch talking to a friend. Defendant approached her and asked if he could play a cassette (Jungle Brothers). She consented and defendant inserted the cassette in the cassette player. Defendant then sat next to LC and her friend and began to talk to them.

During the course of the party, Baumann and LC had an argument because LC would not permit Baumann to use her car. She retreated to her bedroom but went back out to the living room when she heard a door slam. Defendant was present during this exchange.

Baumann testified that, at approximately 12:30 a.m., he cleared everyone out of the apartment except defendant. Baumann told defendant to leave but defendant stated that he would leave after he finished his beer. Baumann agreed and told defendant to lock up before he left. Baumann left the apartment.

LC testified that she left her bedroom when she heard the apartment door slam. Defendant, alone, remained in the living room drinking his beer. The only other people in the apartment were Allen Haayer (Haayer) and his girl friend, Tammie Trahan (Trahan). These two had retired earlier to a second bedroom in the apartment. She knew that they were in the apartment.

She told defendant to finish his beer and leave. Defendant told her that Baumann said that he could sleep on the couch. She told defendant that she preferred for him to finish his beer and either wait outside or leave. Defendant remarked that Baumann was not really going to get something to eat but that he was actually going to see another woman named Stephanie. She knew of this woman and told defendant that it was none of his business. Defendant continued to talk about the "other woman." She asked defendant to leave. Defendant changed the subject, sat next to her, and put his hand on her thigh. She stood up, pushed defendant's hand away, and told him that his behavior was unacceptable. Defendant said okay but later moved over to the couch and put his hand on her thigh. She stood up and told defendant to leave.

As she started walking back to her bedroom so that she could feed her cat, defendant arose and asked for a pair of sweat pants. She thought that defendant had spilled something on his pants so she grabbed a pair of Baumann's shorts from their bedroom and threw them at defendant.

She returned to her bedroom, thought she heard the front door open and close, and went to investigate. As she emerged from the bedroom to lock the front door, defendant punched her in the face. The impact from defendant's blow caused her to fly into the bedroom

door and dresser. A dent that was in the door became a hole. She told defendant to get out and began to scream for Haayer, who was in the second bedroom.

She further testified that defendant punched her, put his fingers down her mouth and throat, and pulled her down to the floor. After getting defendant's fingers out of her mouth, she began to scream. Defendant straddled her and struck her in the arms, face, and neck. Defendant forced himself between her legs, told her to shut up, and put his penis into her vagina. Defendant continued to strike her.

She tried to get defendant off her by telling him that she heard a door opening. Defendant told her that she was lying. Defendant picked her up and threw her on the bed. As she was trying to get away from defendant, she put her foot through the bedroom wall above the headboard.

At some point, Trahan, who was in the adjoining bedroom with Haayer, woke up to what she testified as being a loud and consistent scream. Haayer also heard screams, but was unsure from whence they came. He listened at the bedroom door but heard nothing. Haayer heard more screams and listened at the wall that was common to both bedrooms. He heard LC's voice, "Don't, don't you have to stop." He heard a man answer, "Shut up, all's I'm gonna do is fuck you."

With that, Haayer and Trahan left the apartment and went to the apartment next door to enlist help from a neighbor (Dan Todd). Haayer told Dan Todd that something was wrong with LC and asked him to go next door and investigate. Dan Todd, his brother (George Todd), and Haayer went to Baumann and LC's apartment. Dan Todd knocked on the bedroom door and asked LC whether she was all right. The bedroom door was ajar and hanging on its hinges. LC responded by asking who was at her door. Dan Todd replied that it was "Danny." LC testified that she recognized Dan Todd's voice but was attempting to signal that something was wrong by asking, "Danny who?"

She testified that, at that point, defendant was straddling her, warning her not to say anything. Dan Todd responded, "It's me Dan. Are you all right?" She hesitated but answered in the affirmative. The Todd brothers, concluding that everything was all right, left the apartment. However, Trahan and Haayer remained in the hallway.

After everyone had left, defendant put on a pair of pants and pulled LC out to the living room to show her that no one was there. Defendant then pushed LC back into the bedroom and onto the bed, straddled her, pushed her around, rolled her on her stomach, and

tried to enter her rectally. LC testified that she felt a lot of pain, jerked around, rolled over, and pushed defendant away. Defendant then straddled her and put his penis in her vagina. Defendant ran his mouth over her bloodied nose and mouth and spit her blood back into her face.

Haayer and Trahan, who were sitting in the apartment complex' glass-enclosed foyer, flagged down Doug Ridenour (Ridenour) as he was driving by. Ridenour had attended the party and had driven Baumann to a convenience store and later to Stephanie's (the other woman's) house.

Haayer told Ridenour that he was worried because LC and "the black guy" (defendant) were in the bedroom together. At that moment, two other male partygoers, Dave Shetka (Shetka) and Brian Sonn (Sonn), drove by. Haayer told them that he had heard LC screaming.

The men went up to the apartment, Ridenour knocked on the door, and asked LC whether she was all right. There was no reply.

Meanwhile, defendant warned LC that he did not want any trouble with the police, that he was going to tell the others that she was his girl friend, that they had a fight, and that everything was fine. Defendant wiped her face with one of Baumann's shirts and told her to be quiet.

Defendant left the room telling her not to move. He was wearing a pair of jeans. Ridenour asked defendant what was going on and defendant replied that everything was fine, that his "ride" was there, and that he had to leave.

Testimony was elicited that, as defendant was approaching the front door, LC emerged from the bedroom covering herself with a shirt. She was crying, her face was red and swollen, and she was covered with blood. Ridenour asked her what happened and she responded that defendant raped her.

There was additional testimony that defendant walked quickly towards the front door and grabbed a knife. Ridenour told him to stay. Defendant pushed Ridenour aside, opened the door, and ran out of the apartment. Ridenour, Shetka, and Sonn chased defendant but defendant disappeared.

LC asked for Baumann so Ridenour called Stephanie's house, told her that LC had been raped, and told her to drive Baumann home. Ridenour then reported the incident to the police.

Baumann arrived a few minutes later. He testified that he could tell that LC had been beaten up. Schaumburg police arrived 5 to 10

minutes thereafter. Paramedics arrived, examined LC, and took her to the hospital.

The nurse found her vital signs abnormal. She was bruised under one eye, had abrasions behind one ear, a reddened cheek and scratches to the neck, and a swollen and bleeding lip. The nurse also observed reddened areas on her arms. The nurse did not find any bruises on LC's torso, legs, thighs, buttocks, or feet.

Kathy Matousek (Matousek), one of the paramedics, testified that Baumann's hands were not bruised and that no blood was on Baumann's clothing, and that there was nothing remarkable about his appearance.

The emergency room physician, aside from injuries that the nurse noted, also found that LC had suffered a one-half-inch cut on the roof of her mouth along with bruised tonsils.

The doctor found no signs of external trauma in his gynecological examination. The doctor testified that while one might expect to see signs of trauma in children or virginal females who had been raped, it was common not to find signs of trauma in a case where a nonvirginal woman had been sexually assaulted.

A forensic scientist later examined vaginal and rectal smears taken from LC and found that seminal material was present on both. However, the semen was not typed because the forensic scientist did not have standards from defendant.

Detective Muth (Muth) of the Schaumburg police created a photo lineup from which LC identified defendant as her assailant. Muth testified that LC did not relate to him all of the details to which she testified at trial. Muth attributed that to her physical condition. Even though LC told Muth that Baumann was at the apartment when she emerged from the bedroom, several other witnesses told him that Baumann was not present. Muth testified that he did not attempt to clarify this because he did not notice the discrepancy at first.

The following evening, Delphine Robinson, defendant's mother, went to the Schaumburg police station to report that she knew of her son's whereabouts. Patrol units were immediately dispatched to defendant's Schaumburg home. There, the police arrested defendant.

Muth asked defendant if he knew the whereabouts of his clothing which he had worn to the party. Muth, with defendant's mother's permission, entered defendant's bedroom but did not find any bloodied jeans.

At the Schaumburg police station, Muth read defendant the *Miranda* warnings and a waiver form. Muth asked defendant whether he understood each right. Defendant said that he did but declined to

initial the form because he said he did not want to put anything down in writing. Detective Muth asked defendant whether he wanted to waive his *Miranda* rights and talk, and defendant said he did.

Muth asked defendant to tell him what had happened at the party. Defendant said that earlier that day he had been at a party in Elgin where he drank a few beers. Later, at the convenience store, defendant said that an unknown subject (Baumann) invited him and his friend to a party.

Defendant told Muth that he went to the party, drank a few beers, and just stayed by himself in a corner because he did not know any people there. Everyone started filtering out of the party and by 1 a.m., only he and LC were left in the apartment. Defendant said LC approached him in the living room and said she was upset because she thought that her boyfriend (Baumann) was cheating on her. Defendant said LC told him that it would be okay to have sex with her. The two then went into the bedroom, removed their clothing, and had sexual intercourse. Defendant said that the next thing he knew was that someone was knocking on the door, and LC told him to leave. Defendant slipped on a pair of jeans and left. Muth asked defendant whether he might have gotten carried away during foreplay and struck, slapped, or punched LC. Defendant replied that he never touched LC with his hands as far as slapping or punching.

Defendant told Muth that as he left the apartment that night, he saw some people in the living room who had been at the party earlier that evening. He told these people that he had to get a ride, went to the convenience store, and hitched a ride home from an unknown person.

After defendant rendered this account, defendant's mother and her son Louis Wesley joined defendant and Muth in the room. Muth showed defendant's mother the preprinted *Miranda* waiver form that he had earlier shown defendant. Muth told her that he had read defendant all of his rights but that defendant did not feel comfortable signing anything. Defendant's mother asked some questions about the form, Muth read through the list again and asked defendant whether he understood each right. Defendant answered in the affirmative. Defendant's mother instructed defendant that if he understood his rights, he should initial each line. Defendant initialled the form, dated it, signed his name, and noted the time. Defendant's mother, brother, and detective also signed, dated, and marked the time. At Muth's request, defendant told his mother what had happened the night before.

Muth asked defendant whether he would be willing to make a written statement of the facts he had just recited. Defendant con-

ferred briefly with his mother, who instructed him to give a written statement. Defendant's mother dictated a three-sentence statement which defendant wrote down. The statement said that defendant had cooperated with the Schaumburg police and that he would continue to cooperate with the police until formal charges were brought against him. The statement also indicated that defendant wanted to withhold a written statement until he could obtain legal counsel. Defendant, his mother, his brother, and Muth all signed the form. Defendant's mother and brother left the police station. Muth took photographs of defendant.

George Todd (George) testified for the defense. He did not live in the building, but rather, was visiting his brother, Danny Todd. George had only met LC on two or three prior occasions, and he had never been in her apartment. George had previously met Baumann, but he did not know him well either.

George testified that when he and his brother Danny went to check on LC, he could hear a male and female talking in the bedroom. He did not think LC sounded frightened or nervous, but admitted that four or five seconds elapsed between the time his brother identified himself as "Dan" and the time that LC responded "Dan who?" George assumed that LC was cheating on her boyfriend.

Danny Todd (Danny) lived with his family in the apartment next door to LC and Baumann. He testified that he had known LC and Baumann for about eight months, and that LC had talked with him a number of times about her relationship with Baumann.

According to Danny, one week prior to the rape, he talked with LC and she told him that she was tired of the constant fighting between her and Baumann. She told Danny that the two fought over money, his relationship with Stephanie, and his unemployment. Just the night before, LC had told Todd that she and Baumann had fought about Stephanie, and Baumann put his hand through the bedroom door and his fist through the wall in the bedroom. Danny said that LC told him that Baumann tore the bedroom door off its hinges.

Danny never saw the damage to the door, but his wife Donna did. At trial, she viewed a photograph of the bedroom door taken after the assault, and testified that the condition of the door in the photograph was worse than when she had seen the door a week prior to the rape.

Danny also testified that he had heard Baumann threaten LC but had never known Baumann to make good on his threats, that LC never told him that Baumann had actually hit her, and that he had never seen LC beaten up by Baumann.

On the night in question, Danny testified that he had earlier gone to LC's apartment to ask that the music be turned down. Danny testified that LC, defendant, and LC's friend were the only ones in the apartment. LC told Danny that Baumann had gone to that "fucking bitch's" house, meaning Stephanie.

Danny further testified that when Haayer came over for help on July 8, 1989, Haayer was frantic and said he heard screams. Danny said that when he went to LC's apartment to investigate, he heard LC say, "I don't know where your pants are. They could be over there." Danny did not think he heard anything unusual in LC's voice, and he did not think she was being assaulted. Danny could not tell from LC's voice, however, whether she was having difficulty talking or whether she had been crying. Danny agreed that he thought it was a little strange that LC asked "Dan who?"

Danny testified that about 45 minutes after he had returned to his apartment, he saw Baumann get out of his car and run up the apartment house stairs. Baumann asked where that "fucking nigger" was and said, "I'm going to kill him." Danny said that he stood in front of LC's apartment until Baumann told everybody to leave. Danny then returned to his apartment, where he could hear LC crying.

Peter Sonnefeldt (Sonnefeldt) testified that he investigated this case for the public defender's office. He interviewed Ridenour in his home on three different occasions. Sonnefeldt testified that he took no notes during any of these interviews. After the first interview, he said he sat in his car and made some notes which he later discarded after preparing a written summary. With regard to the second and third interviews, however, Sonnefeldt said he never took any notes or prepared any written summary. Sonnefeldt testified that Doug Ridenour's mother was present for some part of the first interview, although he was not exactly sure which part.

Mrs. Ridenour later testified that she was the one who let Sonnefeldt into her home for the first interview. She said she was present for the entire interview and did not leave at any point, because she was not sure whether her son should be speaking with the investigator. Mrs. Ridenour remembered that Sonnefeldt took notes during this interview. Mrs. Ridenour said she was present during the entire second and third interviews as well.

Sonnefeldt testified that Ridenour told him during the first interview that he thought that LC was trying to get even with Baumann. Ridenour denied ever having made this statement, and Mrs. Ridenour testified she never heard her son say that either. Mrs. Ridenour did not remember hearing Stephanie's name being mentioned. Sonnefeldt

also testified that Mrs. Ridenour told him she thought Baumann was a bum. At trial, Mrs. Ridenour said Sonnefeldt never asked her opinion of Baumann and she never volunteered it because she did not know him.

Defendant's defense was based on consent, the theory that LC had fabricated the rape claim to appease Baumann, and that it was Baumann who inflicted LC's injuries after his friend summoned him back to the apartment.

The jury acquitted defendant on the vaginal assault claim but found defendant guilty of aggravated sexual assault to the anus.

A sentencing hearing was held and the trial court sentenced defendant to serve a term of 14 years in the Illinois Department of Corrections.

OPINION

I

Defendant contends that his venire was unconstitutionally composed because African-Americans were systematically underrepresented. We disagree.

Section 9.2 of the Jury Commissioner's Act (Act) (Ill. Rev. Stat. 1991, ch. 78, par. 32.2) provides that in counties containing more than one million inhabitants, jurors may be drawn from "such parts of the county" as determined by court rule to be most favorable to an impartial trial, and which division of parts will not incur unnecessary expense or unduly burden citizens from any part of the county. The statute provides that the rule may utilize established divisions within the county.

Cook County Circuit Court Rule 0.4 divides Cook County into three parts for the purpose of calling prospective jurors. Part I includes registered voters living anywhere in Cook County, part II includes registered voters living in zip code areas falling north of a certain area, and part III includes registered voters living in zip code areas falling south of the same area.

To establish a *prima facie* violation of the fair-cross-section requirement, the defendant must show:

> "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Duren v. Missouri* (1979), 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587, 99 S. Ct. 664, 668.

■ African-Americans are a distinctive group in the community. Thus, prong 1 on the *Duren* test is satisfied. Regarding the second prong of the *Duren* test, defendant argued that Cook County was a community for sixth amendment purposes and that the venires summoned on the two days of his hearing underrepresented African-Americans as compared to the eligible jury pool in the community of Cook County as a whole. Defendant also asserted that the venires drawn from the northern segment of the county underrepresented a distinct racial group and that 11 months preceding his trial, the venires drawn using this system had underrepresented African-Americans.

However, prong 2 of the *Duren* test has not been satisfied because the venire selection process comported with the due process principles as set out in section 9.2 of the Act. See also *People v. Johnson* (1987), 154 Ill. App. 3d 301, 304, 507 N.E.2d 179.

Prong 3 fails for the same reason. African-Americans were not systematically excluded because the jury selection process was in accordance with County Rule 0.4 and the Act. Further, defendant's attempt to show systematic exclusion of African-Americans in the third municipal district over an 11-month period by having a jury supervisor "count heads" is without probative force because he testified that he based his opinion on personal observation. There is no evidence of record which demonstrates how or under what circumstances this jury supervisor kept count.

Defendant's venire was constitutionally composed.

## II

Defendant next contends that the trial court improperly exercised its discretion in evaluating prospective jurors' impartiality. We disagree.

Supreme Court Rule 234 (Voir Dire Examination of Jurors and Cautionary Instructions) (134 Ill. 2d R. 234) provides:

> "The court shall conduct *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial."

Absent special circumstance, *voir dire* must be left to the discretion of the trial court because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." *Ristaino v. Ross* (1976), 424 U.S. 589, 594-95, 47 L. Ed. 2d 258, 263, 96 S. Ct. 1017, 1020.

We note that in *Turner v. Murray* (1986), 476 U.S. 28, 90 L. Ed. 2d 27, 106 S. Ct. 1683 (an interracial capital case), the Court stated that the

"fact of interracial violence alone is not a 'special circumstance' entitling the defendant to have prospective jurors questioned about racial prejudice." (*Turner*, 476 U.S. at 35 n.7, 90 L. Ed. 2d at 36 n.7, 106 S. Ct. at 1688 n.7.)

In *Turner*, the court indicated that the proper analytical framework for evaluating a defendant's argument is

"whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be indifferent as [they stand] unsworn." *Turner*, 476 U.S. at 33, 90 L. Ed. 2d at 34-35, 106 S. Ct. at 1687.

■■ Here, during the course of the judge's opening remarks to the venire, the trial court advised the jury that they were not to permit sympathy, bias, or prejudice to influence their verdict. With regard to the issue of race, the trial court stated:

"This happens to be a case where the defendant is black and the victim is white, but it is in no way a racial situation, and any race prejudice, anything like that, has nothing to do with this case, and if you have any attitudes reflecting that element, you must set them aside because I can assure you they don't belong in this case, and they should not become involved in this case."

Furthermore, during *voir dire*, the judge asked prospective jurors these questions, among others:

"Do any of you have any bias or prejudice against a person simply because he is charged with a crime?

Would the defendant's race or the fact that the defendant and complaining witness are of different races tend to affect your ability to render a fair and impartial verdict?

Is there anything about the nature of the charge that would affect your ability to be fair and impartial?"

The judge also asked each panel of four prospective jurors the following questions, among others:

"Will you use any sympathy, bias or prejudice in reaching your decision? The purpose of this questioning of the jurors is to select a jury which is free from prejudice. As you sit there now, is there anything on your mind or is there some reason known only to you which would prevent you from reaching a fair and impartial decision in this case?

Are you a member of any fraternal organization which excludes anyone from membership on the basis of race?"

Arguably, the better discretion would have been to ask some of the additional questions requested by defendant. However, the trial court did not abuse its discretion.

## III

Defendant contends that the verdicts were legally inconsistent. We disagree.

LC testified that there were three separate assaults in this case: an act of vaginal penetration, an act of anal penetration, and another act of vaginal penetration. Testimony was elicited that there was a break in time between each act: after the initial vaginal rape took place, Danny and his brother went to the apartment to check on LC. After the Todd brothers left, defendant walked LC around the apartment to show her that no one else was present. Defendant then committed anal sexual assault against LC. To stop this assault, LC rolled over and pushed defendant away. Defendant then committed his second vaginal rape.

The vaginal rape and the rectal rape were charged separately, and the jurors received separate instructions on these counts. The manner of charging and the jury instructions given are considered strong indicators of whether acts are separable for purposes of legal inconsistency analysis. *People v. Spears* (1986), 112 Ill. 2d 396, 405, 493 N.E.2d 1030.

In the instant case, the jurors could have found the evidence sufficient to prove LC's lack of consent to the rectal act, but insufficient to prove her lack of consent to the act of vaginal intercourse. In support of the guilty anal assault verdict, the jury could have relied on LC's testimony that she felt a lot of pain when defendant attempted to penetrate her rectally, and that she rolled over and pushed defendant away.

The verdicts were not legally inconsistent because the findings with respect to each verdict were not mutually exclusive.

The facts in the case at bar are distinguishable from those in *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335, where the Illinois Supreme Court reversed and remanded for new trial the jury's verdicts because the mental states to support the verdicts were legally and logically inconsistent. The *Hoffer* jury found the defendant guilty of murder, voluntary manslaughter, and involuntary manslaughter. *Hoffer*, 106 Ill. 2d 186, 478 N.E.2d 335.

In the instant case, the verdicts were not legally inconsistent.

## IV

Defendant contends that he was entitled to an instruction on battery as a lesser included offense of aggravated criminal sexual assault. We disagree.

A lesser included offense is statutorily defined as an offense which is "established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." Ill. Rev. Stat. 1991, ch. 38, par. 2—9.

An included-offense instruction is required only in cases where the jury could rationally find the defendant guilty of the lesser offense and not guilty of the greater offense. *People v. Perez* (1985), 108 Ill. 2d 70, 81, 483 N.E.2d 250.

Reviewing courts need not consider alleged error in rejecting a defendant's request for a jury instruction on the lesser included offense of simple battery if the evidence is so overwhelming that no rational jury could have concluded that simple battery was an appropriate verdict. See *People v. Mitchell* (1984), 105 Ill. 2d 1, 14, 473 N.E.2d 1270.

In *People v. Bryant* (1986), 113 Ill. 2d 497, 499 N.E.2d 413, the Illinois Supreme Court set forth the analysis applicable here. The rationale for permitting instructions on lesser included offenses is to provide "an important third option to a jury which, believing that the defendant is guilty of something but uncertain whether the charged offense has been proved, might otherwise convict rather than acquit the defendant of the greater offense." *Bryant*, 113 Ill. 2d at 502.

Further, instructions on lesser included offenses are not appropriate in every case because the evidence adduced at trial might preclude the use of an instruction on a lesser offense. (*Bryant*, 113 Ill. 2d at 507.) Thus, a lesser included offense instruction is properly given when the evidence would permit the jury rationally to find the defendant guilty of the lesser included offense and not guilty of the greater offense, and where the charged greater offense would require the jury to find a disputed factual element which is not required for conviction on the lesser included offense. *Bryant*, 113 Ill. 2d at 507.

Aggravated criminal sexual assault is defined as follows:

"(a) The accused commits aggravated criminal sexual assault if he or she commits criminal sexual assault and any of the following aggravating circumstances existed during the commission of the offense:

\*\*\*

(2) the accused caused bodily harm to the victim; or

(3) the accused acted in such a manner as to threaten or endanger the life of the victim or any other person." Ill. Rev. Stat. 1991, ch. 38, par. 12—14.

Defendant requested the following instruction on battery as a lesser included offense:

"A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." Ill. Rev. Stat. 1991, ch. 38, par. 12—3.

The Illinois Supreme Court has held that battery by bodily harm is not an included offense of rape and a defendant is not entitled to an instruction on battery by bodily harm in a prosecution for rape. *People v. Mays* (1982), 91 Ill. 2d 251, 258, 437 N.E.2d 633.

Defendant contends that battery committed when an offender makes physical contact of an insulting or provoking nature is properly considered a lesser included offense of rape. Defendant relies, for this contention, upon the case of *People v. Margiolas* (1983), 117 Ill. App. 3d 363, 366, 453 N.E.2d 842.

However, *Margiolas* is factually distinguishable from the case at bar. In *Margiolas*, once inside the bedroom, the defendant attempted to unbutton complainant's blouse and told her to give him "some." The complainant made a verbal objection and tried to stop him by grabbing his hand. The defendant, however, continued to fumble with the complainant's blouse until it was unbuttoned halfway. The defendant forced complainant to sit on a bed, pulled down her pants and underpants, and unzipped his trousers. Complainant lay back on the bed and told him, "Just don't hurt me." The defendant got on top of the complainant and had sexual intercourse with her.

At trial, the *Margiolas* court granted the defendant's motion for a directed finding as to the rape charge due to the lack of evidence of resistance, as well as the lack of evidence of "futility of fear." The lower court then ordered the trial to proceed as to the lesser included offense of battery based on contact of an insulting or provoking nature. Defense rested, the court entered a finding of guilty, and the defendant appealed. On these facts, the appellate court affirmed the trial court. *Margiolas*, 117 Ill. App. 3d at 365.

■ The magnitude of the physical acts charged in this case could not be accurately categorized as physical contact of merely an insulting or provoking nature. Instructions on lesser included offenses are

not appropriate in every case because the evidence adduced at trial might preclude the instruction. *Bryant*, 113 Ill. 2d at 507.

Based on the evidence adduced at trial in this case, the trial court correctly rejected the battery instructions.

## V

■ Defendant contends that he was not proven guilty beyond a reasonable doubt. We disagree.

On review, the test is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) Moreover, it is the jury's responsibility to "resolve factual disputes, assess the credibility of the witnesses, and determine the weight and sufficiency of the evidence." (*People v. Yates* (1983), 98 Ill. 2d 502, 518, 456 N.E.2d 1369.) And, the jury's judgment will not be usurped unless the evidence is so unsatisfactory or improbable that a reasonable doubt remains. *Yates*, 98 Ill. 2d at 518-19.

Trahan testified that she was awakened when she heard someone screaming loudly. Haayer also testified that he heard screaming.

Additionally, defendant claims that LC's failure to cry for help when Danny was at her door lessens her credibility. But LC testified that when Danny came to check on her, defendant was straddling her and warning her to stay silent. Defendant also argues that it defies credibility to believe that he would give up rectal assault simply because LC said that it was painful. However, LC testified that defendant simply straddled her again and put his penis in her vagina.

Defendant asserts that the sufficiency of the evidence was weakened because the police did not recover LC's torn clothing on the night of her assault. However, a police officer testified that clothing was strewn all over the bedroom, and he recovered only those items which were in the area where he was told the assault took place. Also, there was testimony that the police did recover a bloodstained white tee-shirt, a bloodstained jersey, a bloodstained pillow case, and a bloodstained bed sheet.

A police officer further testified that although he did not recover the print shirt on the night of the assault, he remembered seeing it by the bed, and in fact it was visible in one of the photographs he had taken that night.

## VI

■ Defendant contends that the trial court erred by rejecting defendant's various evidentiary objections. We disagree.

### A

Defendant's contention that the court erred in permitting LC to testify that she suffered from permanent vision problems and continued to suffer headaches as a result of the assault is not well founded. LC testified as to the effects of the incident but she did not testify that her condition was permanent. Such testimony was permissible.

### B

Defendant contends that the trial court erroneously allowed a prosecution witness to opine on whether absence of genital trauma was consistent with rape thus invading the province of the jury.

This contention is not well founded as the doctor testified that absence of genital trauma did not necessarily constitute absence of penetration. He did not determine the ultimate issue, which was whether the victim had been raped. Thus, he did not invade the province of the jury.

### C

Defendant contends that his conviction should be reversed because the State added paramedic Matousek to its list of witnesses mid-trial and called her. Defendant also asserts error because it was barred from cross-examining Matousek on her refusal to talk to defense counsel concerning her testimony.

Paramedic Matousek's testimony did not constitute error because she was called as a rebuttal witness. Trial courts may allow rebuttal witnesses to be called.

While it would have been error for the State to advise Matousek not to talk to the defense, defendant did not present evidence demonstrating that the State so advised Matousek. We are cognizant of a third district opinion, *People v. McCollum* (1992), 239 Ill. App. 3d 593, 607 N.E.2d 240, which provides that a witness' refusal to talk to the other side in advance of trial may be brought out on cross-examination. However, the better rule is that an objection sustained by the court as to an attempt to cross-examine a witness about his refusal to talk to an adverse party generally is not error. *People v. Brown* (1980), 87 Ill. App. 3d 368, 372, 409 N.E.2d 81.

## D

Defendant's contention that his stationhouse statement was erroneously admitted as a false exculpatory statement against penal interest when defendant conceded intercourse with LC is without merit as the State may choose to present any statement made by defendant even if it appears to be exculpatory on the theory that it may be treated as an admission.

## E

Defendant's contention that the trial court erroneously denied defendant the opportunity to introduce evidence of his reputation for veracity when it granted the State's motion *in limine* and barred evidence of his reputation for truthfulness is without merit because defendant's character for truthfulness was not in issue.

## F

Defendant's contention that the trial court improperly denied his motion *in limine* to bar admission of his prior theft conviction is without merit because the evidence was admissible under *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.

## G

Defendant's contention that the trial court should have excluded testimony concerning photographs of defendant which were obtained from police files because their use prejudicially informed the jury that defendant had a prior police record is without merit because the officer testified neither that the photograph was a mug shot nor about a prior arrest.

## H

Defendant's contention that the trial court's refusal to allow certain testimony on the relative sizes of defendant and an available rescuer was error is without merit because the jury could give appropriate weight to this issue based upon testimony already heard regarding the size of LC's "available rescuer."

Further, trial courts are vested with wide discretion in allowing the cross-examination of witnesses.

Defendant's contention that the trial court erroneously restricted cross-examination of LC on the nature and quality of her relationship with Baumann is without merit because it was within the trial court's

province to determine whether the scope and relevance of such cross-examination was proper.

## I

Defendant contends that the trial court improperly admitted the "Jungle Brothers" cassette tape into evidence because it was irrelevant. We disagree.

Evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 487, 568 N.E.2d 864.) Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. (*Gonzalez*, 142 Ill. 2d at 487-88.) Trial courts are given broad discretion in ruling on issues of relevancy and materiality, and a court's decision is generally not overturned absent an abuse of discretion. *People v. Williams* (1990), 196 Ill. App. 3d 851, 866, 554 N.E.2d 1040.

Here, the cassette tape was relevant because the testimony surrounding it showed that, contrary to defendant's story as elicited through Detective Muth that defendant was uncomfortably standing alone in a corner at the birthday party, he in fact asked LC if he could play his cassette, showed LC's friend some dance moves, and asked a woman to dance.

## VII

Defendant contends that the trial court abused its discretion by imposing a 14-year sentence. We disagree.

A trial court's sentencing decisions are entitled to great deference and weight since it is in a better position than a reviewing court to fashion an appropriate penalty. *People v. Streit* (1991), 142 Ill. 2d 13, 18-19, 566 N.E.2d 1351.

Although a trial court's discretion in making sentencing decisions is not unbridled, reviewing courts may not alter the sentence absent an abuse of discretion. *Streit*, 142 Ill. 2d at 19.

■ Here, the trial court affirmed that in reaching its sentencing decision, it took into account the evidence at trial, the contents of the presentence report, the evidence and information offered by the respective parties during the sentencing hearing, and the statements offered by LC and the defendant.

Finally, we note that a juror dispatched a post-trial communication appealing for leniency because she felt that defendant was simply in the wrong place at the wrong time. However, this letter cannot properly be considered on appeal. The sentence was within the permissible range of the trial court's discretion.

Affirmed.

GORDON, P.J., and McNULTY, J., concur.