2012 COA 36

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Mustafa J. UJAAMA, Defendant–Appellant.**

No. 08CA0128.

Colorado Court of Appeals, Div. I.

March 15, 2012.

299

John W. Suthers, Attorney General, Majid Yazdi, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Alan Kratz, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge DAILEY.

¶ 1 Defendant, Mustafa J. Ujaama, appeals the judgments of conviction entered on jury verdicts finding him guilty of first degree murder (after deliberation) and aggravated motor vehicle theft. We affirm.

## I. Background

¶ 2 While defendant, his wife, S.R., and six-year-old stepdaughter, I.R., lived together in a home in Denver, S.R. began a romantic relationship with the victim, Timothy Kaufman. On June 11, 2006, defendant and S.R. had an argument during which S.R. took defendant's cell phone and defendant took S.R.'s cell phone.

¶ 3 The next morning, defendant drove to Aurora to pick up his children at his ex-wife's home and take them to school. Upon returning home, defendant apologized to S.R. for arguing with her and took her to their bedroom, where they became intimate. As they were becoming intimate, defendant told S.R. that he had a surprise for her. A short time later, S.R. heard a knock at the door, at which point, according to S.R., defendant said, "Your surprise is here," got out of bed, took a gun from the closet, and walked out into the living room. S.R. then heard several gunshots, after which I.R. ran into the bedroom, saying that defendant had killed Kaufman. S.R. and I.R. fled the home through a bedroom window.

¶ 4 Defendant had shot Kaufman eight or nine times, including in the heart, the groin, and the back (three times). Upon determining that Kaufman was dead, defendant found a key to Kaufman's car, located the car, and drove it to the back of the house. Defendant wrapped Kaufman in "bubble wrap" and a rug, put him in the trunk of the car, and drove to Aurora, where he abandoned the car near his ex-wife's home.

¶ 5 Although defendant, in the company of his lawyer, turned himself in to the police later that day, the car and Kaufman's body were not located until the next day.

¶ 6 At trial, the prosecution asserted that, after taking S.R.'s cell phone, defendant read text messages that revealed her romantic relationship with Kaufman, and, posing as S.R., lured Kaufman to the home to kill him. In support of this theory, the prosecution presented evidence indicating that Kaufman had come to the home prepared to have sex,[1] as well as phone records showing that, earlier that morning, Kaufman had exchanged approximately thirty text messages with whoever had possession of S.R.'s phone.[2] To corroborate S.R.'s testimony that defendant had her phone, while she had his, the prosecution presented phone records showing that (1) a call—which originated near the ex-wife's house in Aurora—was made from S.R.'s phone to a man whom defendant had previously contacted in Seattle to buy a car; and (2) a call was made from defendant's phone to S.R.'s mother.

¶ 7 I.R. testified via closed-circuit television. She related that, while reading in the living room, she heard a knock and saw Kaufman—whom she knew as one of her mother's coworkers—enter the home through an unlocked door. According to I.R., Kaufman said, "Hi," to her, and then defendant, without saying anything, "came out with a gun, and ... shot him."

¶ 8 Defendant asserted that he shot Kaufman in self-defense or in response to Kaufman's intrusion into his home. To that end, he testified that

- he was vigilant about the security of his home and paranoid about his family's safety;
- after his fight with S.R., he put her cell phone on its charger, did not see it again, and did not have it on the day of the shooting;
- the surprise he told S.R. about was a new car;
- when he and S.R. were in the bedroom, she stated that she heard a knock at the door and that someone had entered the house;

---

1. Kaufman had arrived at the home shirtless, with two condoms and a "blue" pill in his shorts.

2. Defendant's, S.R.'s, and Kaufman's cell phones were not recovered by the police; consequently, the prosecution was unable to prove the actual content of the messages.

- as he exited the room with his gun, he saw a shirtless, muscular man moving toward him with one hand raised;

- he shot the intruder several times; and

- fearing that the police might kill him if he called them to the house, he decided to take Kaufman's body to the police station, but, en route, left the car near his ex-wife's home so he could contact a lawyer.

¶ 9 The prosecution argued that the location of Kaufman's wounds was inconsistent with defendant's self-defense theory, and the jury found him guilty of first degree murder (after deliberation) and aggravated motor vehicle theft. Subsequently, the trial court sentenced him to a controlling term on the murder count of life imprisonment without possibility of parole.

### II. Closed–Circuit Television Testimony

¶ 10 Defendant contends that the trial court violated his federal confrontation rights by allowing I.R. to testify via closed-circuit television without sufficient grounds to do so.[3] We disagree.

¶ 11 Before trial, the prosecution filed a motion, pursuant to section 16–10–402, C.R.S.2011, to present the then eight-year-old I.R.'s, testimony via closed-circuit television. The prosecution based its motion on the following circumstances: defendant was I.R.'s stepfather; she observed him kill a person that she knew; she had not seen him since the shooting; she had been in counseling for several months; and, she "would suffer serious emotional distress if forced to testify in front of [defendant] and ... [would] not be able to communicate ... what she witnessed."

¶ 12 Defendant responded, in writing, arguing that he had the right to confront I.R.

during trial and that she would be able to communicate rationally and articulately in open court.

¶ 13 On the morning of trial, the prosecutor, as an offer of proof, stated:

[I.R.] is eight years old. She has not seen the defendant since she saw him kill [Kaufman]. She was in counseling for a great part of the year. It took a substantial amount of counseling to get her to the point that she is sleeping in her own bed, sleeping through the night, able to even converse about this.

¶ 14 The prosecutor offered to provide testimony on these issues from I.R.'s grandmother. Defendant objected that it was "pure speculation" that I.R. would suffer severe emotional distress or trauma by testifying in the courtroom.

¶ 15 The trial court ruled:

[B]ased on the People's offer of proof[,] I don't think there needs to be direct testimony ... because the way the statute is written, it is left pretty much entirely to my discretion. Based on the fact that since this incident, [I.R.] has been receiving counseling, I think that's enough of a showing to meet the standard that's stated in [section 16–10–402(1)(a)(II), C.R.S.2011].

¶ 16 In light of the trial court's ruling, we will assume, without deciding, that defendant's "pure speculation" objection was sufficient to preserve the present issue for appeal. *See People v. Melendez*, 102 P.3d 315, 322 (Colo.2004) ("We do not require that parties use 'talismanic language' to preserve particular arguments for appeal, but the trial court must be presented with an adequate opportunity to make findings of fact and

---

3. Defendant has never asserted that the state constitutional confrontation guarantee in Colorado Constitution article II, section 16 provides him greater protection than does its federal counterpart. Consequently, we have no reason to address this issue. *See People v. Mershon*, 874 P.2d 1025, 1030 n. 2 (Colo.1994) (declining to address state constitutional argument, where the trial court's order was based on the federal constitution and the defendant, in his briefs before the court of appeals, never argued that the state

constitution should be construed to give him greater protection than the federal constitution); *People v. Rodriguez*, 209 P.3d 1151, 1156 (Colo. App.2008) ("Where, as here, a defendant does not make a specific objection, with a separate argument, under the state constitution, we must presume the defendant's objections are based on federal, not state, constitutional grounds, and limit our review accordingly."), *aff'd*, 238 P.3d 1283 (Colo.2010).

conclusions of law on any issue before we will review it.").[4]

■ ¶ 17 A defendant has a federal constitutional right to confront adverse witnesses at trial. *See* U.S. Const. amend. VI. However, the federal constitution does not require that a defendant be allowed in all instances to confront an adverse witness face-to-face in court. *People v. Rodriguez,* 209 P.3d 1151, 1156 (Colo.App.2008), *aff'd,* 238 P.3d 1283 (Colo.2010).

¶ 18 In *Maryland v. Craig,* 497 U.S. 836, 857, 110 S.Ct. 3157, 3170, 111 L.Ed.2d 666 (1990), a closely divided Supreme Court upheld a defendant's sexual assault convictions despite the victims' having testified outside her presence via one-way, closed-circuit television. The Supreme Court reasoned that the "preference" for face-to-face confrontation "must occasionally give way to considerations of public policy and the necessities of the case." *Id.* at 848–49, 110 S.Ct. at 3165 (quoting *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895)).

■ ¶ 19 In *Craig,* the Court recognized that a state's interest in protecting the physical and psychological well-being of child abuse victims could, in some cases, be sufficiently important to outweigh a defendant's right to face his or her accusers in court. *Id.* at 853, 110 S.Ct. at 3167. Such a case is presented when the trial court finds that (1) a special procedure is necessary to protect the welfare of the particular child witness; (2) the particular child witness would be traumatized by the presence of the defendant—not by the proceedings generally; and (3) the child witness will suffer more than de minimis emotional distress if forced to testify in the presence of the defendant. *Id.* at 855–56, 110 S.Ct. at 3169.

¶ 20 In Colorado, section 16–10–402 represents the General Assembly's judgment as to how best, and under what circumstances, to accommodate the public's interest in protecting testifying child witnesses consistent with a defendant's right to confront adverse witnesses. *See Rodriguez,* 209 P.3d at 1156–57. Consistent with *Craig,* section 16–10–402 authorizes the use of closed-circuit television to obtain the live testimony of a child who "at the time of a trial is ... less than twelve years of age" when "[t]he judge determines that testimony by the witness in the courtroom and in the presence of the defendant would result in the witness suffering serious emotional distress or trauma such that the witness would not be able to reasonably communicate." § 16–10–402(1)(a)(II); *see Rodriguez,* 209 P.3d at 1157.

■ ¶ 21 On appeal, defendant argues that, under *Craig,* the trial court could not authorize the use of a closed-circuit television procedure to take I.R.'s testimony on the basis of an offer of proof alone; actual evidence of psychological trauma to the child was required. We are not persuaded.

¶ 22 Defendant correctly notes that, in *Craig,* the Supreme Court stated that the "requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." 497 U.S. at 855, 110 S.Ct. at 3169. However, in *Craig,* the Court also declined "to establish, as a matter of federal constitutional law, any ... categorical evidentiary prerequisites for the use of the one-way television procedure." *Id.* at 860, 110 S.Ct. at 3171. Rather, it held that "[s]o long as a trial court makes ... a case-specific finding of necessity, the Confrontation Clause does not prohibit ... using a one-way closed circuit television procedure for the receipt of testimony by a child witness." *Id.*

■ ¶ 23 Unless an evidentiary hearing is constitutionally or statutorily required, a court may resolve factual issues relevant to pretrial motions based on "affidavits or in such other manner as the court may direct." Crim. P. 12(b)(4). As we read *Craig,* it does not require actual receipt of evidence before

---

**4.** *But cf. People v. Moore,* 226 P.3d 1076, 1082 (Colo.App.2009) ("The purpose of an objection is not only to express disagreement with a proposed course of action, but also to identify the grounds for disagreement. An objection must be specific enough to provide the trial court with a meaningful opportunity to prevent or correct the error.").

a court can permit a child to testify via closed-circuit television. Nor, by its terms, does section 16–10–402(1)(a)(II) require the receipt of actual evidence before permitting a child to testify via that procedure.

¶ 24 In other contexts, divisions of this court have recognized that a trial court possesses the discretion to make pretrial determinations in any reasonable manner, including giving each party the opportunity to present evidence using offers of proof. *See People v. Moore,* 117 P.3d 1, 3 (Colo.App. 2004) (determining the admissibility of evidence of prior acts of domestic violence); *People v. Groves,* 854 P.2d 1310, 1313 (Colo. App.1992) (determining the admissibility of evidence of prior acts of sexual assault and homicide). We perceive no reason why such a procedure would be inadequate in the present context.

¶ 25 "The wisdom of the *Craig* court's rejection of [categorical evidentiary prerequisites] becomes obvious when one contemplates the potential dangers of setting hard and fast evidentiary prerequisites." *State v. Foster,* 81 Wash.App. 444, 915 P.2d 520, 526 n. 4 (1996), *aff'd,* 135 Wash.2d 441, 957 P.2d 712 (1998). Here, despite an opportunity to do so, defendant did not contest the substance of the prosecution's offer. At best, he contested the means by which that information was conveyed, as well as the sufficiency of the information to support the relief requested by the prosecution. Because he did not contest the substance of the prosecution's proffer, there was no need for the trial court to take evidence to resolve disputed issues of fact. Nor was there a necessity to receive expert evidence. *See id.* ("[E]xpert testimony is not always required to establish the necessary predicate for the trial court's determination.")

¶ 26 Under the circumstances, we perceive no fundamental unfairness, or abuse of the court's discretion, in using an offer of proof in lieu of actual evidence to resolve the prosecution's motion.

### III. Sufficiency of Evidence—Aggravated Motor Vehicle Theft

¶ 27 We also reject defendant's contention that his aggravated motor vehicle theft con-

viction must be reversed because there was insufficient evidence that he committed the offense underlying that crime.

¶ 28 We review the record de novo to determine whether the evidence before the jury was sufficient to sustain defendant's convictions. *Dempsey v. People,* 117 P.3d 800, 807 (Colo.2005).

¶ 29 When examining the sufficiency of the evidence, we determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime charged beyond a reasonable doubt. *People v. Grant,* 174 P.3d 798, 811 (Colo.App. 2007). A modicum of relevant evidence will not rationally support a conviction beyond a reasonable doubt, *People v. Torres,* 224 P.3d 268, 277 (Colo.App.2009); however, "[i]f there is evidence upon which one may reasonably infer an element of the crime, the evidence is sufficient to sustain that element." *Grant,* 174 P.3d at 812; *cf. id.* ("where reasonable minds could differ, the evidence is sufficient to sustain a conviction").

¶ 30 Here, the charged underlying offense for aggravated motor vehicle theft, section 18–4–409(2)(d), C.R.S.2011, was attempted concealment of death, sections 18–2–101(1) and 18–8–109, C.R.S.2011.

¶ 31 A person commits criminal attempt if, acting with the kind of culpability otherwise required for commission of an offense, he or she engages in conduct constituting a substantial step toward the commission of the offense. § 18–2–101(1). "A substantial step is any conduct, whether act, omission, or possession, which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." *Id.*

¶ 32 A person commits the crime of concealing death when he or she "conceals the death of another person and thereby prevents a determination of the cause or circumstances of death." § 18–8–109; *see People v. T & S Leasing, Inc.,* 763 P.2d 1049, 1051 (Colo.1988) (applying section 18–8–109).

¶ 33 Here, the prosecution presented evidence that, after killing Kaufman, defendant wrapped his body in a rug, put his body in the trunk of a car, drove the car to a different county, abandoned the car by the side of a road, and never revealed the location of the car or body to the police. Viewed in the light most favorable to the prosecution, this evidence was sufficient to allow the jury to conclude that defendant took a substantial step toward concealing Kaufman's death to prevent an accurate determination of the cause or circumstances of his death.

¶ 34 In so concluding, we necessarily reject defendant's argument that he could not be found guilty of attempting to conceal Kaufman's death because he left Kaufman's automobile parked on a city street where it would have been inevitably discovered in a relatively short period of time. The crime for which defendant was convicted, however, was not attempting to conceal an automobile, but attempting to conceal a death. A jury could reasonably find that, by placing Kaufman's body in the locked trunk of the automobile, and the automobile far from the scene of the crime, defendant was attempting to avoid implication in Kaufman's death, at least long enough for evidence of the cause or circumstances of death to dissipate.

¶ 35 Because sufficient evidence was presented at trial to support a conviction of attempted concealment of death, defendant is not entitled to reversal on this ground.

## IV. Unpreserved Issues

¶ 36 Defendant raises seven other issues on appeal. However, those issues are not properly preserved for appellate review.

¶ 37 An issue is unpreserved for review when, among other things, (1) no objection or request was made in the trial court, see People v. Miller, 113 P.3d 743, 751 (Colo. 2005) (instructions); People v. Clark, 214 P.3d 531, 542 (Colo.App.2009) (prosecutorial misconduct), aff'd on other grounds, 232 P.3d 1287 (Colo.2010); People v. Baca, 852 P.2d 1302, 1308 (Colo.App.1992) (evidence); or (2) an objection or request was made in the trial court, but on grounds different from those raised on appeal, see People v. Renfro, 117

P.3d 43, 47 (Colo.App.2004), or on unspecific grounds which would not have alerted the trial court to the issue of which the defendant now seeks review. See Rodriguez, 209 P.3d at 1156.

¶ 38 Here, defendant did not make timely or specific objections in the trial court to the seven other matters he raises on appeal. Consequently, reversal is not warranted in the absence of plain error. See Crim. P. 52(b); People v. Malloy, 178 P.3d 1283, 1288 (Colo.App.2008).

¶ 39 The plain error rule reflects a "careful balancing of [the] need to encourage all trial participants to seek a fair and accurate trial the first time around against [the courts'] insistence that obvious injustice be promptly redressed." United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982).

¶ 40 "At best, plain error is strong medicine." United States v. Simmonds, 931 F.2d 685, 687 (10th Cir.1991). It should provide a basis for relief only on rare occasions because (1) it is difficult to "fault a trial court for failing to rule on an issue that had not been presented to it," id. at 688, and (2) an accused should not be able to "withhold his objections until completion of his trial ... and later complain of matters which, if he had made a timely objection, would have allowed the trial court to take corrective action." People v. Rollins, 892 P.2d 866, 874 n. 13 (Colo.1995).

¶ 41 Consequently, relief under the plain error doctrine is limited to certain types of errors, having a certain type of effect. See Malloy, 178 P.3d at 1288 (plain error is error that is "obvious," "substantial," and "grave").

¶ 42 "Plain error assumes that the [trial] court should have intervened sua sponte because the error was so obvious." People v. Petschow, 119 P.3d 495, 505 (Colo. App.2004). To qualify as plain error, the error must be one that "is so clear-cut, so obvious," a trial judge should be able to avoid it without benefit of objection. People v. Taylor, 159 P.3d 730, 738 (Colo.App.2006). An error may be "obvious," for purposes of the plain error rule, if the issue has been decided by a division of this court or the

Colorado Supreme Court, or if the trial court has engaged in a clearly erroneous application of statutory law. *See People v. Mendoza,* —— P.3d ——, —— n. 4, 2011 WL 4837499 (Colo.App.2011).

■ ¶ 43 Plain error, however, must not only be "obvious"; it must also be seriously prejudicial: the error's effect must be so grave that it "undermine[s] the fundamental fairness of the trial itself [so] as to cast serious doubt on the reliability of the conviction." *Taylor,* 159 P.3d at 738–39.

¶ 44 With these principles in mind, we now examine defendant's remaining seven contentions.

### A. Evidentiary Issues (3)

■ ¶ 45 For the following reasons, we reject defendant's contentions that plain error occurred as a result of the admission of certain evidence in the case:

● Although the prosecution elicited evidence that defendant exercised his *Miranda*[5] right to remain silent, it was allowed to do so after defendant told the jury that he (1) went to the police station to make himself available for the investigation and to tell the police what happened; and (2) was not trying to conceal anything from the police. *See generally Golob v. People,* 180 P.3d 1006, 1012 (Colo.2008) ("The concept of 'opening the door' represents an effort by courts to prevent one party in a criminal trial from gaining and maintaining an unfair advantage by the selective presentation of facts that, without being elaborated or placed in context, create an incorrect or misleading impression. When a party opens the door to otherwise inadmissible evidence, his opponent may then inquire into the previously barred matter.") (citation omitted); *see also People v. Davis,* —— P.3d ——, ——, 2010 WL 2105878 (Colo.App.2010) *(cert. granted*

*on other grounds* Dec. 20, 2010) (a testifying defendant may be impeached with his otherwise constitutionally protected, post-*Miranda* advisement silence to rebut a claim asserted by the defendant at trial);

● Given that I.R. testified at trial, defendant was not denied his constitutional confrontation rights by the admission of two videotaped statements she had given to the authorities. *See People v. Argomaniz–Ramirez,* 102 P.3d 1015, 1018 (Colo.2004) (the admission of prior out-of-court statements made by a witness who testifies at trial and is subject to cross-examination does not violate a defendant's right to confrontation); *People v. Whitman,* 205 P.3d 371, 381 (Colo. App.2007) (same); *People v. Galloway,* 726 P.2d 249, 253 (Colo.App.1986) (a defendant's confrontation rights were not violated by the admission of child hearsay under section 13–25–129, C.R.S.2011, where child testified and the defendant cross-examined him); [6] and

○ Any error in admitting evidence that defendant's mother and ex-wife were uncooperative with the police was neither "obvious" nor "grave":

○ The inability to find defendant's, S.R.'s, and Kaufman's cell phones was a hotly contested issue. As pertinent here, defendant maintained that he never saw his or S.R.'s phone after their argument, and the prosecution theorized that defendant's mother was responsible for the disappearance of his phone. Accordingly, evidence that the mother—who, at some point, possessed the phone—was unwilling to speak to the police without an attorney was relevant because it tended to make more probable than it would have been without the evidence that the mother purposefully withheld the cell phone from law enforcement offi-

---

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** In so holding, we necessarily reject defendant's reliance on *Thomas v. People,* 803 P.2d 144 (Colo.1990), and *People v. Newbrough,* 803 P.2d 155 (Colo.1990), as misplaced. In both cases, the issue before the court was whether the ad-

mission of videotaped depositions of child victims under section 18–3–413, C.R.S.2011—in lieu of live testimony—violated the defendants' confrontation rights. Because I.R. testified in person—rather than via video deposition—*Thomas* and *Newbrough* are clearly distinguishable.

cials. *See* CRE 402 & 403 (favoring the admissibility of relevant evidence); CRE 401 (defining relevant evidence); and

○ The prosecution was entitled to cross-examine the ex-wife, who testified for the defense, to point out any bias she had in defendant's favor, *see generally People v. Sommers*, 200 P.3d 1089, 1096 (Colo.App.2008), and, to that end, it could arguably, at least, elicit evidence of her refusal to cooperate with the police until she received immunity for herself. *See generally People v. McCollum*, 239 Ill.App.3d 593, 180 Ill.Dec. 346, 607 N.E.2d 240, 243 (Ill.App.Ct.1992) ("Although a witness has a right to refuse to cooperate with or to be interviewed by the other side, that refusal can be shown in court to demonstrate bias, hostility, prejudice, or interest in the outcome. As such, the refusal to talk to the other side in advance of the trial is a proper matter to bring out on cross-examination."). Certainly, no statute or Colorado case prohibited the inquiry.

*B. Instructional Issues (3)*

▮▮▮▮ ¶ 46 In the context of jury instructions, the supreme court has stated that, for plain error purposes, an error is sufficiently grave if a reasonable possibility exists that the error contributed to the defendant's conviction. *Miller*, 113 P.3d at 750.[7]

¶ 47 For the following reasons, we perceive no instructional plain error in this case:

*1. Self-defense*

▮▮▮ ¶ 48 The People concede that the trial court erroneously included in its self-defense instruction irrelevant references to initial aggressor, combat by agreement, and provocation concepts.

¶ 49 We perceive no plain error in the court's self-defense instruction. The evidence did not raise any initial aggressor, combat by agreement, or provocation issues, nor did the prosecution ever argue that any of those concepts constituted a basis upon which the jury could reject defendant's defense of self-defense. Indeed, the prosecution never mentioned any of these concepts

7. This "reasonable possibility" of prejudice test is also used in evaluating the harmlessness of preserved contentions of constitutional error. *See, e.g., People v. Moore*, 251 P.3d 451, 454 (Colo.App.2010) ("[U]nder the constitutional standard of harmless beyond a reasonable doubt, [reversal is required] where there is a reasonable possibility that the defendant could have been prejudiced."); *People v. Orozco*, 210 P.3d 472, 476 (Colo.App.2009) ("[Under the constitutional harmless error test,] '[i]f there is a reasonable possibility that the defendant could have been prejudiced, the error cannot be harmless beyond a reasonable doubt.' Conversely, an error 'is harmless beyond a reasonable doubt "if there is no reasonable possibility that it affected the guilty verdict." ' ") (citation omitted) (quoting *People v. Trujillo*, 114 P.3d 27, 32 (Colo.App. 2004), and *People v. Chavez*, 190 P.3d 760, 765 (Colo.App.2007)). Indeed, the only difference in analyzing instructional plain error prejudice and preserved constitutional error prejudice in Colorado lies with the party bearing the burden of persuasion. *Compare People v. Butler*, 224 P.3d 380, 386 (Colo.App.2009) (the prosecution bears the burden of showing the harmlessness of preserved errors of constitutional magnitude), *with People v. Boykins*, 140 P.3d 87, 95 (Colo.App. 2005) ("In review for plain error, the defendant has the burden of persuasion with respect to prejudice.").

Because, however, the plain error doctrine is to be applied sparingly, in light of the interests served by the contemporaneous objection rule, a greater likelihood of harm should be required for plain error prejudice than is required to obtain reversal for preserved issues of constitutional error. Indeed, the United States Supreme Court has so concluded, in applying a substantially identical plain error rule. *Compare United States v. Marcus*, 560 U.S. 258, ——, 130 S.Ct. 2159, 2164, 176 L.Ed.2d 1012 (2010) (to meet the prejudice prong of the plain error test, "there must be a reasonable probability that the error affected the outcome of the trial"), *with Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (under the constitutional harmless error test, "[t]he question is whether there is a reasonable possibility that the [error] contributed to the conviction") (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)); *see also, e.g., United States v. Wisecarver*, 598 F.3d 982, 989 (8th Cir.2010) (under the plain error rule, "[a]n error is prejudicial if the defendant shows 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different' ") (quoting *United States v. Kent*, 531 F.3d 642, 656 (8th Cir.2008)).

or attempted, in any way, to imply that they were even applicable. Instead, the prosecution theorized that defendant, posing as S.R., lured Kaufman to the home under the false pretense that Kaufman would have sex with S.R. By its very nature, this theory would not encompass issues concerning an initial aggressor, combat by agreement, or provocation.

¶ 50 Because, under these circumstances, the initial aggressor, combat by agreement, and provocation concepts were superfluous and, as such, neither imposed any extra burden on defendant nor interfered with his self-defense theory, there is no reasonable possibility that their inclusion in the instruction contributed to his conviction. Consequently the error was not plain. *See Baca,* 852 P.2d at 1307 (inclusion of an unnecessary instruction did not require reversal because it "did not pose any barrier to the jury giving full consideration to the defendant's theory of defense"); *see also People v. Manzanares,* 942 P.2d 1235, 1241 (Colo.App. 1996) (where there was no evidence that the defendant initiated the fight and the prosecutor did not mention the instruction in closing argument, unwarranted initial aggressor instruction was harmless).[8]

### 2. Use of Force Against an Intruder ("Make–My–Day")

¶ 51 The trial court instructed the jury, as follows, on the "make-my-day" principles codified in the statute authorizing use of force against an intruder, section 18–1–704.5(2), C.R.S.2011:

It is an affirmative defense ... that the defendant used physical force, including deadly physical force, against another person that

(1) while the defendant was an occupant of a dwelling,

(2) the other person made an unlawful entry into that dwelling,

(3) the defendant had a reasonable belief that the other person was committing or intended to commit a crime in the dwelling in addition to the uninvited entry,

(4) and the defendant reasonably believed the other person might have used any physical force, no matter how slight, against any occupant of the dwelling.

In order for this affirmative defense to apply, the other person must have made an entry into the dwelling in known violation of the criminal law. An entry made accidentally, or in the good faith belief it is lawful, is not unlawful.

¶ 52 In a separate instruction, the trial court informed the jury that the prosecution "has the burden of proving the guilt of the defendant ... beyond a reasonable doubt as to the affirmative defenses."

¶ 53 Defendant contends that the court's "make-my-day" instruction was erroneous because it (1) permitted the jury to conclude that the prosecution had no burden of disproving the affirmative defense until he first proved that Kaufman entered the dwelling in known violation of the criminal law; and (2) unduly limited his right to respond with force to a situation in which he had reason to

---

**8.** To the extent that defendant argues that the mere mention of superfluous concepts may have caused the jury to speculate about possible application of the concepts, this argument is itself speculation, and not ground for finding plain error. *See, e.g., Jones v. United States,* 527 U.S. 373, 394–95, 119 S.Ct. 2090, 2105, 144 L.Ed.2d 370 (1999) ("Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights."); *United States v. Lombardozzi,* 491 F.3d 61, 74 (2d Cir.2007) ("[W]here 'the effect of an error on the result in the district court is uncertain ... indeterminate' or only speculative, we cannot conclude that [the defendant's] substantial rights have been affected.") (quoting *United States v. Williams,* 399 F.3d 450, 458 (2d Cir.2005)); *State v. Clinkscale,* 122 Ohio

St.3d 351, 911 N.E.2d 862, 870 (2009) ("Speculation does not suffice to demonstrate plain error.").

In this regard, defendant's reliance on *Kaufman v. People,* 202 P.3d 542, 562 (Colo.2009), is misplaced. In *Kaufman,* the court held that an erroneous combat by agreement instruction could have led the jury to "wonder[ ] why it was given the instruction, decided that it must have been for some purpose, and forced the evidence to fit the instruction." However, in that case, there was evidence of a fight following the parties' initial aggression, but no evidence of a clearcut agreement to fight. Thus, *Kaufman* is distinguishable because, unlike in this case, there was some evidence that could have caused the jury to believe that combat principles applied.

believe that the intruder had already used force against an occupant of the house.

### a. Shifting the Burden of Proof

¶ 54 Under section 18–1–407, C.R.S. 2011, once a defendant presents some credible evidence supporting the applicability of an affirmative defense, the prosecution bears the burden of proving the guilt of the defendant as to the issue raised by the affirmative defense.

¶ 55 Relying on *People v. Janes*, 982 P.2d 300 (Colo.1999), defendant contends that the trial court's instructions impermissibly shifted to him the burden of proof with respect to the "unlawful entry" component of the make-my-day defense. In *Janes*, the trial court gave an "unlawful entry" instruction which stated:

> To find the defendant not guilty based upon the lawful use of deadly physical force against an intruder, you must find that the victim made a knowingly unlawful entry into the defendant's apartment. An entry that is uninvited is not necessarily unlawful. This defense is not available if the victim entered the apartment in the good faith belief he was making a lawful entry.

*Id.* at 303.

The supreme court found the instruction deficient:

> Logically, the jury could have concluded that the burden was on the defendant to prove the conditions set forth in [the "unlawful entry"] [i]nstruction.... As Janes points out, this is especially problematical with respect to the language ... that the defense does not apply if the victim entered the condominium with the good faith belief that he acted lawfully. Clearly it is not the defendant's burden at trial to prove that the victim did not enter in good faith.

*Id.* at 303–04.

¶ 56 Defendant argues that the language, "In order for this affirmative defense to apply," in the make-my-day instruction here had the same burden-shifting potential as the language in the "unlawful entry" instruction in Janes. Viewing that language in a vacuum, we would agree with defendant. However-

er, as we read the opinion in *Janes*, the supreme court did not reverse based on this potential defect in the instruction, but because other instructions did not make clear to the jury which party had the burden of proof with respect to the affirmative defense of "make-my-day." *See id.* at 304 ("[T]he jury instructions, when read as a whole, confused or misled the jury as to the burden of proof applicable to the affirmative defense of 'make-my-day.' ").

¶ 57 In *Janes*, besides the "unlawful entry," instruction, there were separate instructions on the make-my-day defense and on affirmative defenses. The affirmative defense instruction set forth the burden of proof, and referenced the make-my-day instruction, but not the "unlawful entry" instruction. Further, the unlawful entry instruction was not identified for the jury as an affirmative defense. Thus, the supreme court concluded, "[T]he jury had no reason to know that the prosecution's burden of proof with respect to affirmative defenses ... applied to [the "unlawful entry"] [i]nstruction...." *Id.* at 303.

¶ 58 That is not the case here. Unlike in *Janes*, the "unlawful entry" principles were included *within* the make-my-day instruction, *which identified* the make-my-day defense as an affirmative defense. And, as the separate affirmative defense instruction clearly set forth the prosecution's burden of proof as to these types of defenses, the instructions, when read together, *see People v. Zamarripa–Diaz*, 187 P.3d 1120, 1122 (Colo.App. 2008), prevented the jury from concluding that defendant carried any burden with regard to proving any part of the make-my-day defense.

### b. Belief in a Past, as Opposed to a Possible Present, Use of Force

¶ 59 As to defendant's second point, the court's "make-my-day" instruction was phrased in terms of whether defendant "reasonably believed that the [intruder] *might have used* any physical force ... against an occupant" of the home. (Emphasis added.) In contrast, the "make-my-day" statute is worded in terms of whether the occupant of a dwelling "reasonably believes that [the in-

truder] *might use* any physical force …
against an occupant." *See* § 18–1–704.5(2)
(emphasis added).

¶ 60 The difference in language between
the instruction and the statute, defendant
asserts, created the possibility that even if
the jury concluded that, at the time of the
shooting, he had a reasonable belief that the
intruder might use physical force against an
occupant, it could nonetheless reject the de-
fense if it concluded that defendant had no
reasonable belief that Kaufman might have
already used physical force.

¶ 61 Although the instruction was worded
in terms of whether the intruder "might have
used force," the phrase was susceptible of
being read either, as defendant urges, "might
have *already* used" force or, as the People
contend, "might have used force *at any
time.*"

¶ 62 For several reasons, the language of
the instruction given by the court did not
constitute plain error. First, the prosecu-
tor's statements regarding the "make-my-
day" defense in closing argument did not
encourage the jury to interpret the "might
have used" language improperly. Second,
only speculation supports the idea that the
jury interpreted the instruction as defendant
does, and "[s]peculation does not suffice to
demonstrate plain error." *State v. Clinks-
cale,* 122 Ohio St.3d 351, 911 N.E.2d 862, 870
(2009); *see also* n. 7, *supra* (citing authori-
ties). Third, because the instruction tracks
the applicable pattern instruction, *see* COL-
JI–Crim. H:23 (2008), and, no prior Colora-
do case has held it deficient, any error would
not have been obvious to the trial court.[9]

### 3. Concealing Death

¶ 63 As previously mentioned, the charge
of attempted concealing death, section 18–8–
109, served as the underlying offense for first
degree aggravated motor vehicle theft. *See*
§ 18–4–409(2)(d).

**9.** In this regard, this case is distinguishable from
*People v. Phillips,* 91 P.3d 476 (Colo.App.2004),
in which the trial court instructed the jury that,
to utilize the defense, the defendant must have
had a reasonable belief that the intruder *had
committed* a crime in the dwelling. A division of
this court held that the "had committed" lan-
guage imposed too strict a requirement because

¶ 64 A person commits the crime of con-
cealing death when he or she "conceals the
death of another person and thereby pre-
vents a determination of the cause or circum-
stances of death." § 18–8–109; *see T & S
Leasing, Inc.,* 763 P.2d at 1051 (applying
section 18–8–109).

¶ 65 In his opening brief, defendant con-
tends that the jury instruction for the offense
of concealing death erroneously failed to re-
quire proof of "knowingly" or any other cul-
pable mental state. He is mistaken: the in-
struction explicitly contains the culpable
mental state of "knowing." According to the
instruction, the elements of the crime of con-
cealing death are "(1) That the Defendant,
(2) in the City and County of Denver, State
of Colorado, on or about June 12, 2006, (3)
prevented a determination of the cause of
death or circumstances of death, (4) by *know-
ing[ly]* concealing the death of another per-
son." (Emphasis added.)

¶ 66 Nonetheless, defendant asserts
that the instruction erroneously failed to ap-
ply the "knowing" culpable mental state to
the element of the crime of preventing a
determination of cause or circumstances of
death. *Cf.* § 18–1–503(4), C.R.S.2011
("When a statute defining an offense pre-
scribes as an element thereof a specified
culpable mental state, that mental state is
deemed to apply to every element of the
offense unless an intent to limit its applica-
tion clearly appears.").

¶ 67 The simple answer to this assertion is:
any error here could not be plain error. The
statute does not prescribe a "knowing" (or
any other) culpable mental state, nor has it
been interpreted to require one (much less
one applicable to each of the statute's two
requirements).

¶ 68 Section 18–1–503(2), C.R.S.2011, pro-
vides:

the language of section 18–1–704.5(2) also al-
lowed for the defense upon a reasonable belief
that the intruder "was committing or intended to
commit a crime in the dwelling." *Phillips,* 91
P.3d at 481. The present pattern instruction and
the instruction given in this case are phrased in
accord with the *Phillips* decision.

Although no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of that offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such a culpable mental state.

It is, at the very least, debatable as to whether this "interpretive convention" applies to a construction of section 18–8–109. As stated by the very authority upon which defendant relies, "[This] interpretive convention does not help much here, for the proscribed conduct—concealment—does not 'necessarily involve' any culpable mental state. One can easily imagine unintentional, unknowing, non-reckless, even nonnegligent concealment." Marianne Wesson, *Mens Rea and the Colorado Criminal Code*, 52 U. Colo. L.Rev. 167, 180 (1981) (discussing crime of concealing death).

¶ 69 Because neither the language of the statute nor prior case law imposes a mental state requirement in conjunction with the crime, much less its "preventing a determination," prong, any error in omitting it from part of the court's instruction could not have been obvious.

### C. Prosecutorial Misconduct in Closing Argument

 ¶ 70 Prosecutorial misconduct in closing argument rarely constitutes plain error. *People v. Strock*, 252 P.3d 1148, 1152–53 (Colo.App.2010). In order to qualify as such, the misconduct must be flagrantly, glaringly, or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Weinreich*, 98 P.3d 920, 924 (Colo.App.2004), *aff'd*, 119 P.3d 1073 (Colo.2005). Improper closing argument rises to this level if its probable effect is a verdict based on bias and prejudice rather than on the relevant facts and applicable law. *People v. Mandez*, 997 P.2d 1254, 1268 (Colo.App.1999).

¶ 71 On appeal, defendant argues that the prosecutors repeatedly went beyond the bounds of permissible advocacy by improperly (1) referring to his silence after having been advised of his *Miranda* rights; (2) commenting on the ex-wife's and mother's refusal to cooperate in the investigation, on the advice of counsel or in the absence of an immunity agreement; (3) undermining the presumption of innocence; (4) appealing to the jury's sympathy or prejudices; (5) offering personal opinions; (6) misstating the evidence and the law; and (7) attacking defendant's credibility.

¶ 72 We discern no error with regard to nearly all of the comments made by the prosecutors during closing argument. In our view, these comments were consistent with the principles set forth in the following cases: *Domingo–Gomez v. People*, 125 P.3d 1043, 1051–52 (Colo.2005) ("While the language used by the prosecutor was susceptible to being considered a personal opinion, upon careful review of the context in which the prosecutor used these expressions, we do not consider them to have fallen to the level of improper expressions of the prosecutor's personal opinion."); *People v. Gladney*, 250 P.3d 762, 769 (Colo.App.2010) (a prosecutor may ordinarily "employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance," and may comment on "the evidence admitted at trial, the inferences that can reasonably and fairly be drawn from it, and the instructions of law submitted to the jury") (quoting *People v. Collins*, 250 P.3d 668, 678 (Colo.App.2010), and *People v. Rojas*, 181 P.3d 1216, 1223 (Colo.App.2008)); *People v. Robinson*, 391 Ill.App.3d 822, 330 Ill.Dec. 519, 909 N.E.2d 232, 250 (2009) ("[A] prosecutor may challenge a defendant's credibility and the credibility of his defense theory, as well as the persuasiveness of the defense. This includes referring to the defense theory as 'ridiculous.' ") (citations omitted); *Slaven v. Commonwealth*, 962 S.W.2d 845, 859 (Ky.1997) (prosecutor's reference to the defendant as "a cold-blooded murderer" was not misconduct because a "prosecutor can state his opinion of a defendant's guilt if his opinion is based on the evidence"); *Commonwealth v. Chamberlain*, 30 A.3d 381, 408 (Pa.2011) (prosecutor's reference to the defendant as a murderer was not misconduct because "he argued that the evidence and the reasonable inferences therefrom led to the

conclusion that [the defendant] was a murderer").

¶ 73 We question, however, the prosecution's comments, "[W]ith all the evidence you have heard, [defendant] has shattered his presumption of innocence," and "[The] only way to obtain justice in this courtroom, to seek what [the jury] ... sought when [it] took that oath as jurors, is to find [defendant] guilty of the murder that he committed."

¶ 74 The first of these two comments impermissibly undermined defendant's presumption of innocence, *see People v. McBride*, 228 P.3d 216, 224 (Colo.App.2009); and the second arguably injected the prosecutor's personal opinion into the case. Neither, however, was so flagrant or improper, or had the effect of casting serious doubt on the reliability of the verdict, as to constitute plain error. *See People v. Villa*, 240 P.3d 343, 357 (Colo.App.2009) (misstatements regarding the presumption of innocence were not plain error because the references were brief, the court's instructions on the presumption of innocence were clear, and there was no objection by the defendant which would amplify the improprieties); *People v. Kenny*, 30 P.3d 734, 741 (Colo.App.2000) (although prosecutor's comment asking jury to bring justice to the victim and the people of Colorado arguably injected a personal opinion, as well as an appeal to community wishes, into the case, it was not plain error because it did not undermine the fundamental fairness of the trial).

¶ 75 The judgments of conviction are affirmed.

Judge TAUBMAN and Judge FOX concur.