JUSTICE GABRIEL,
dissenting.
¶19 The majority implicitly concludes that the word “intended” in the definition of “deadly physical force,” § 18-l-901(3)(d), C.R.S. (2016), is ambiguous. The majority then defines the term “in its objective implication, as referring to the consequence that would normally or typically be intended.” Maj. op. ¶ 16. In light of this construction, the majority concludes that the division below erred in construing “intended” as referring to the actor’s subjective intent and in applying that definition to hold that Opana was entitled to an ordinary force self-defense instruction. Id. at ¶¶ 17-18.
¶20 In my view, the definition of “deadly physical force” is clear and unambiguous, and the tern “intended,” as used therein, refers to the subjective intent of the actor who is asserting self-defense. Even if the definition were ambiguous, however, I believe that the majority’s construction is untenable because it impermissibly renders the term “intended” meaningless and mere surplusage.
¶21 Because I believe that the division below correctly construed the term “intended,” and because I agree with the division that the trial court plainly erred in not giving an ordinary force self-defense instruction, see People v. Opana, No. 10CA1987, slip op. *763 at 5-9, 2014 WL 2211393 (Colo. App. May 29, 2014), I respectfully dissent.
I. Factual Background
¶22 Although the majority’s brief recitation of the facts is accurate, see maj. op. ¶¶ 3-8,1 do not believe that it fully captures what the evidence showed regarding the events at issue.
¶23 Opana, who suffers from problems with his balance due to the amputation of one of his feet and certain other disabilities, lived with the victim and another man in the other man’s home. The evidence showed that the victim, whom Opana considered a friend, had a reputation for drinking and becoming violent when he drank, and Opana was aware of this reputation.
¶24 On the day in question, Opana, the victim, and the homeowner had spent the day drinking. This continued into the evening, when Opana and the homeowner sat on the porch drinking while the victim remained in the house drinking and listening to music.
¶25 At some point during the evening, Opana retrieved his jacket from his room. While there, he also grabbed a handgun, which he had only recently obtained, because he wanted to get used to carrying it around. In addition, at several times during the evening, the homeowner went into the house to turn down the victim’s music. Each time, the victim would turn the music back up.
¶26 Thereafter, the victim left to buy more alcohol. At that point, Opana went inside and turned the music down. When the victim returned, however, he went to the porch and told Opana that he “shouldn’t have turned that music down.” He then went back inside.
¶27 A few minutes later, the victim reemerged, made another comment about the music, and then hit Opana on the head, possibly with a hammer. The victim then started punching Opana and saying, “Yeah, nigga,” as Opana, who, because of his disabilities, could not fight back, tried to crawl away. Eventually, the victim stopped and went back inside.
¶28 Twenty minutes passed, and the victim returned and began punching Opana again. Opana again tried to get away, but the victim continued punching him, saying, “Yeah, nig-ga.” The victim eventually stopped and went back inside.
¶29 Opana testified that he did not use his gun during these attacks because he did not feel that the victim would seriously injure or kill him. After the victim had left, however, Opana took out the gun and said to the homeowner, “[H]e just don’t know how close he came.”
¶30 Opana and the homeowner remained on the porch for another hour, when the homeowner went to bed and Opana went to a neighbor’s house, still carrying his gun.
¶31 Opana returned some time later, having decided to move out. When he entered the house, he went to the room with the stereo and saw the victim sitting in a reclining chair. Opana told the victim of his plans to move and said that he would be out before noon the next day. At that point, the victim allegedly replied, “Yeah, nigga,” slammed a beer on the table, and tried to stand up but fell back into the chair. The victim then tried to stand again, and Opana pulled out his gun. According to Opana, he feared that the victim was going to attack him again, and he pulled out the gun simply to “scare” the victim. Opana testified, however, that his disabilities caused him to lose his balance and that he accidentally pulled the trigger and shot his friend in the chest.
¶32 At trial, Opana introduced expert testimony to support his theory that the gun had discharged accidentally, and he maintained that he was attempting to use only ordinary physical force in self-defense.
II. Analysis
¶33 I first address the applicable standard of review and principles of statutory construction. I then address what I believe to be the proper construction of the term “intended” as it is used in the statutory definition of “deadly physical force.” § 18-l-901(3)(d). I conclude by explaining why I believe the trial court plainly erred in not giving an ordinary force self-defense instruction.
*764 A.Principles of Construction
¶34 We review issues of statutory construction de novo. Doubleday v. People, 2016 CO 3, ¶ 19, 364 P.3d 193, 196. Our primary purpose in statutory construction is to ascertain and give effect to the intent of the General Assembly. Id We look first to the language of the statute, giving words and phrases their plain and ordinary meanings. Id. We read statutory words and phrases in context, and we construe them according to the rules of grammar and common usage. Id. In addition, we read the statutory scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts. Id. at ¶ 20, 364 P.3d at 196. We must avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results. Id.
¶35 If the statute is unambiguous, then we need not conduct any further statutory analysis. Id. If, however, the statute is ambiguous, then we may look to other interpretive aids to determine the legislature’s intent. Lewis v. Taylor, 2016 CO 48, ¶ 20, 375 P.3d 1205, 1209. A statute is ambiguous when it is reasonably susceptible of multiple interpretations. See Hunsaker v. People, 2015 CO 46, ¶ 11, 351 P.3d 388, 391.
B.Proper Meaning of “Intended”
¶36 “Deadly physical force” is defined as “force, the intended, natural, and probable consequence of which is to produce death, and which does, in fact, produce death.” § 18-l-901(3)(d).
¶37 Although it does not say so directly, the majority implicitly concludes that the term “intended” as used in the foregoing definition is ambiguous. From that premise, the majority proceeds to conclude that “intended” should be given an “objective implication” and defines the term “as referring to the consequence that would normally or typically be intended.” Maj. op. ¶ 16. For several reasons, I respectfully disagree with the majority’s construction.
¶38 First, I perceive no ambiguity in section 18-l-901(3)(d). “Intend” is ordinarily defined to mean, “[t]o have in mind a fixed purpose to reach a desired object; to have as one’s purpose.” Intend, Black’s Law Dictionary (10th ed. 2014); see also Intend, Webster’s Third New Int’l Dictionary (2002) (defining “intend” to mean, “to have in mind as a design or purpose”); cfi § 18-1-501(5), C.R.S. (2016) (providing that a person acts “intentionally” or “with intent,” for purposes of the culpable mental state requirement of certain offenses, “when his conscious objective is to cause the specific result proscribed by the statute defining the offense,” and stating that “[i]t is immaterial to the issue of specific intent whether or not the result actually occurred”).
¶39 By referring to what the actor has “in mind,” the above-quoted definitions suggest that “intent” refers to the actor’s subjective mental state. This fully comports with what I believe to be the plain and ordinary meaning of the word “intend.”
¶40 Accordingly, I would construe “intended,” as that term is used in section 18-1-901(3)(d), to refer to the subjective state of mind of the actor who is using the deadly physical force.
¶41 Second, as noted above, in interpreting a statute, we must read the statutory scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts and avoiding constructions that would render any words or phrases superfluous. Doubleday, ¶ 20, 364 P.3d at 196.
¶42 The majority defines “intended” to refer to “the consequence that would normally or typically be intended.” Maj. op. ¶ 16. In my view, however, “the consequence that would normally or typically be intended” is simply another way of saying the “natural[ ] and probable consequence” of the action at issue. Accordingly, in defining “intended” as it does, the majority has effectively written the word “intended” out of the definition of “deadly physical force.” Specifically, as noted above, “deadly physical force” is defined as “the intended, natural, and probable consequence” of the act at issue. § 18-l-901(3)(d). In my view, the conjunctive “and” requires that all three of these elements be satisfied: “intended,” “natural,” and “probable consequence.” By defining “intended” as it has, the majority has essentially subsumed “intended” within the phrase “natural[ ] and proba *765 ble consequence,” rendering the term “intended” meaningless, or at least superfluous. This we cannot do. Doubleday, ¶ 20, 364 P.3d at 196.
¶43 For these reasons, I would conclude that the term “intended,” as used in section 18-l-901(3)(d), refers to the actor’s (here, Opana’s) subjective intent. Because it is undisputed that Opana’s evidence tended to show that he lacked the requisite intent to kill the victim, I believe that the division below correctly concluded that Opana was entitled to an ordinary force self-defense instruction.
C. Plain Error
¶44 The question for me thus becomes whether the trial court plainly erred when it did not give an ordinary force self-defense instruction. Like the division below, I believe that it did.
¶45 Plain error addresses error that is both obvious and substantial and that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. People v. Miller, 113 P.3d 743, 750 (Colo. 2005).
¶46 To qualify as plain error, an error must generally be so obvious that a trial judge should be able to avoid it without the benefit of an objection. Scott v. People, 2017 CO 16, ¶ 16, 390 P.3d 832, 835. For an error to be this obvious, the action challenged on appeal ordinarily “must contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law.” People v. Pollard, 2013 COA 31M, ¶ 40, 307 P.3d 1124, 1133 (citations omitted); see also People v. Ujaama, 2012 COA 36, ¶ 42, 302 P.3d 296, 304-05 (noting that an error may be obvious when it has been decided by the Colorado Supreme Court or a division of the court of appeals).
¶47 Here, the precise question before us was decided years before Opana’s trial by the division in People v. Vasquez, 148 P.3d 326, 329 (Colo. App. 2006). There, construing section 18-l-901(3)(d), the division stated:
Unless we were to either eliminate, as surplusage, the word “intended” or construe the statute to include an additional word (i.e., “or”) between “intended” and “natural,” we would have to conclude that, in Colorado, an intent element is a necessary ingredient of “deadly physical force.” We are not inclined either to strike or add a word to the legislature’s definition.
Id,
¶48 The trial court here was aware of Vasquez and, indeed, specifically referenced it. Yet, the court did not apply it. In these circumstances, I believe that the error was obvious. See Ujaama, ¶ 42, 302 P.3d at 304-05.
¶49 I also believe that the error was substantial and that it so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. Because Opana did not use deadly physical force as defined in section 18-l-901(3)(d), and because the trial court did not give an ordinary force self-defense instruction, Opana was effectively deprived of his principal defense to the charges against him. Moreover, I cannot say that the evidence in this case was overwhelming. The evidence at trial, which was largely circumstantial, tended to show that the victim’s death occurred after a day of drinking and after the victim had attacked the disabled Opana several times throughout the evening. In addition, Opana consistently argued that' when he shot the victim, he feared that the victim was going to attack him again, that he had pulled out his gun merely to “scare” the victim, and that he had accidentally pulled the trigger when he lost his balance. He also introduced expert testimony to support his theory that the gun, which he had only recently obtained, had discharged accidentally, killing his friend.
¶50 Accordingly, I would conclude, as did the division below, that the trial court plainly erred in not instructing the jury on ordinary force self-defense.
¶51 In reaching this conclusion, I am not persuaded by the People’s argument that any error was not obvious because divisions of the court of appeals had split on the question now before us. In particular, the People argue that Vasquez created a division split between it and People v. Ferguson, 43 P.3d *766 705 (Colo. App. 2001). I perceive no such conflict.
¶52 In Ferguson, 43 P.3d at 709, the division concluded that the trial court had erred in giving a deadly physical force self-defense instruction when the victim had not, in fact, died. This error “allowed the jury to hold defendant to a more stringent standard in establishing self-defense than was required of him.” Id.
¶53 In Vasquez, 148 P.3d at 330, in contrast, the division concluded that the trial court had erred in giving only a deadly force self-defense instruction when the victim had died but when the evidence supported an ordinary force self-defense instruction.
¶54 Accordingly, these cases presented different issues, and I perceive no conflict between them (nor, apparently, did the Vasquez division, which relied on Ferguson, see id. at 330).
III. Conclusion
¶55 Because I believe that the division below correctly construed the term “intended,” and because I agree with the division that the trial court plainly erred in not giving an ordinary force instruction, I would affirm the division’s judgment. I thus respectfully dissent.
I am authorized to state that JUSTICE HOOD joins in this dissent.