Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 30, 2017

**2017 CO 56**

**No. 14SC820, <u>People v. Opana</u>—Criminal Trials.**

The People petitioned for review of the court of appeals' judgment reversing Opana's conviction for second degree murder, in the shooting death of one of his housemates. <u>See</u> <u>People v. Opana</u>, No. 10CA1987 (Colo. App. May 29, 2014). The district court instructed the jury as to the use of deadly physical force in defense of one's person. In consideration of the statutory definition of the term "deadly physical force," which limits the applicability of the term to "force, the intended, natural, and probable consequence of which is to produce death," the court of appeals determined that there was adequate evidence produced at trial for the jury to have found that Opana used physical force not rising to the level of "deadly" physical force, and it concluded that in this case the failure of the trial court to instruct the jury, sua sponte, on the use of physical force generally amounted to plain error.

The supreme court reversed the judgment of the court of appeals and remanded the case for consideration of the defendant's remaining assignments of error because the court of appeals misconstrued the definition of "deadly physical force," and when that

statutory term is properly construed, the evidence at trial did not support an instruction

on self-defense predicated on the use of other-than-"deadly" physical force.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2017 CO 56

**Supreme Court Case No. 14SC820**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 10CA1987

**Petitioner:**

The People of the State of Colorado,

v.

**Respondent:**

Kalani Opana.

## Judgment Reversed
*en banc*
May 30, 2017

**Attorneys for Petitioner:**
Cynthia H. Coffman, Attorney General
Jillian J. Price, Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Respondent:**
Douglas K. Wilson, Public Defender
Elizabeth Porter-Merrill, Deputy Public Defender
  *Denver, Colorado*

**JUSTICE COATS** delivered the Opinion of the Court.
**JUSTICE GABRIEL** dissents, and **JUSTICE HOOD** joins in the dissent.

¶1    The People petitioned for review of the court of appeals' judgment reversing Opana's conviction for second degree murder, in the shooting death of one of his housemates.  See People v. Opana, No. 10CA1987 (Colo. App. May 29, 2014).  The district court instructed the jury as to the use of deadly physical force in defense of one's person.  In consideration of the statutory definition of the term "deadly physical force," which limits the applicability of the term to "force, the intended, natural, and probable consequence of which is to produce death," the court of appeals determined that there was adequate evidence produced at trial for the jury to have found that Opana used physical force not rising to the level of "deadly" physical force, and it concluded that in this case the failure of the trial court to instruct the jury, sua sponte, on the use of physical force generally amounted to plain error.

¶2    Because the court of appeals misconstrued the definition of "deadly physical force," and when that statutory term is properly construed, the evidence at trial did not support an instruction on self-defense predicated on the use of other-than-"deadly" physical force, the judgment of the court of appeals is reversed, and the case is remanded for consideration of the defendant's remaining assignments of error.

**I.**

¶3    Kalani Opana was charged with first degree murder in the shooting death of one of his housemates.[1]  A jury acquitted him of first degree murder but convicted him of

---

[1] The defendant was initially charged also with two counts of committing a crime of violence, which were dismissed before trial.

the lesser included offense of second degree murder, and he was sentenced to a term of twenty-four years in the custody of the department of corrections.

¶4    The defendant testified on his own behalf at trial, and by his own account he shot the victim in the chest, at close range, with a .40 caliber semiautomatic handgun. There were varying witness accounts of a night of drinking, fighting, and abusive, racial epithets directed at the defendant by the victim, after which, according to the defendant's testimony, he returned from a neighbor's house in the early morning hours with the intention of notifying the victim that he was going to collect his things and move out. The defendant testified that when the victim attempted to stand and repeated the racial epithet he had uttered prior to an earlier assault, the defendant drew his gun, as a show of force to dissuade the victim from attacking him again. The defendant asserted that the gun slipped, and when he reflexively tightened his grip, it accidentally discharged, killing the victim. He expressly testified that he did not intend to pull the trigger.

¶5    The defendant requested and was given a theory-of-the-case instruction, in which the jury was informed of his explanation why a correct application of the law to the facts of the case should result in his acquittal. The defendant's theory-of-the-case instruction indicated that he did not commit the elements of the crime of first degree murder, or any lesser offense before the jury, because he did not intentionally discharge the handgun at all. In addition, it indicated that "he attempted to use self-defense by a show of force" and that "he quickly pulled out the handgun to defend himself through a show of force."

3

¶6     The defendant also requested and received an instruction as to the affirmative defense of defense of person, or self-defense. The affirmative defense instruction given to the jury, however, instructed only as to the conditions under which the use of deadly physical force would be justified in self-defense, and not the conditions under which the use of physical force other than deadly physical force would be justified in self-defense. The record does not clearly reflect which party drafted or offered the particular affirmative defense instruction that was ultimately given, but there is no contention that the defendant objected to it as erroneous or inadequate.

¶7     On direct appeal, the court of appeals found that the defendant failed to object to the instruction that was given or to request an additional self-defense instruction, but it nevertheless reversed, finding plain error. The court of appeals found that the applicable statutory definition limits "deadly physical force" to force which the actor uses with an intent to produce death; and because there was evidence from which the jury could have found that the defendant in this case did not actually intend to kill the victim, the court should have instructed the jury, sua sponte, on the use of other-than-"deadly" physical force in self-defense. Apart from one the court of appeals considered likely to arise on retrial, the defendant's remaining assignments of error were left unaddressed.

¶8     The People petitioned this court for a writ of certiorari.

**II.**

¶9     With specifically enumerated exceptions, the Colorado Criminal Code provides a legal justification for using physical force upon another person if that physical force is

4

used to defend the person using it from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he uses only a degree of force he reasonably believes to be necessary for that purpose. § 18-1-704(1), C.R.S. (2016). Among the aforementioned exceptions are further restrictions on the use of deadly physical force. § 18-1-704(2)(a). In addition to reasonably believing that a lesser degree of force would be inadequate, a person is justified in using deadly physical force upon another person only under additional specified conditions, including, as pertinent here, that he also has reasonable grounds to believe, and does in fact believe, that he is in imminent danger of being killed or receiving great bodily injury. Id. The use of physical force by someone upon another person is therefore legally authorized and excused from constituting what would otherwise be a crime only if it meets the statutory requisites for using force of the degree and nature actually used. See §§ 18-1-704(1)–(2).

¶10     With regard to the statutory defense of person, the term "deadly physical force" is used as a term of art. It is statutorily defined to mean "force, the intended, natural, and probable consequence of which is to produce death, and which does, in fact, produce death." § 18-1-901(3)(d), C.R.S. (2016). In summarily concluding that "[w]here there is a factual dispute about whether a defendant intended to cause death by his or her use of force, and in fact caused death, both ordinary physical force and deadly physical force instructions must be given," Opana, slip op. at 5, the intermediate appellate court offered no reasoning of its own but relied entirely on the authority of the prior holding of another division in People v. Vasquez, 148 P.3d 326 (Colo. App.

5

2006). The division in <u>Vasquez</u> had largely reasoned that because the adjectives "intended," "natural," and "probable," modifying—through a prepositional phrase—the noun "force" in the definition of "deadly physical force," were conjoined rather than disjoined, it would be necessary to understand the term "intended" as adding "an intent element" to the meaning of "deadly physical force" in order to avoid effectively reading the term out of the definition altogether. 148 P.3d at 329. The <u>Vasquez</u> court did not, however, entertain any question concerning the meaning of the term "intended" as used by the legislature in this context or any question that the unstated subject intended by the legislature's passive construction could be someone other than the defendant.

¶11 A statute has meaning according to the legislative intent expressed in the language of the statute itself. <u>People v. Jones</u>, 2015 CO 20, ¶ 10, 346 P.3d 44, 48. If a statute is clear and unambiguous, and is not in conflict with another statute, it must simply be applied as written. <u>Holcomb v. Jan-Pro Cleaning Sys. of S. Colo.</u>, 172 P.3d 888, 890 (Colo. 2007). However, to the extent that the language of a statute is susceptible of more than one reasonable interpretation, and is therefore considered ambiguous, a substantial body of interpretive aids, either provided by the legislature to explain its own drafting conventions and preferences for resolving conflicts, <u>see</u> § 2-4-203, C.R.S. (2016), or developed by the courts over centuries, <u>see generally</u> Norman J. Singer & Shambie Singer, <u>Sutherland Statutes & Statutory Construction</u> (7th ed. 2007), is available to assist in determining which of these reasonable understandings embodies the legislative intent. <u>Jones</u>, ¶ 10, 346 P.3d at 48. Whether consideration of

6

the meaning of the terms involved, the syntax of the sentence in which they appear, and the context or manner in which that sentence is related to surrounding provisions should more appropriately be characterized as reliance on internal aids of construction in resolving ambiguity, or simply considerations leading to the conclusion that there is no ambiguity in the first place, is of little consequence here.

¶12    With regard to the meaning of the term "intended," the Vasquez court's characterization of the definition of "deadly physical force" as including "an intent element as a necessary ingredient" suggests its understanding that "intended" is used in the definition as a term of art, referring to the culpable mental state of "intentionally" or "with intent." See 148 P.3d at 329–30; see also § 18-1-501(5), C.R.S. (2016). While the statutory culpable mental state can now have only a subjective meaning[2]—that the actor has a conscious objective to cause a specific result proscribed by statute—it is also specifically limited in applicability to the culpable mental state required for the commission of an offense. § 18-1-501(5); see, e.g., People v. Wheeler, 772 P.2d 101, 103 (Colo. 1989) (explaining that where "intent" is used in the Criminal Code other than as an element of an offense, statutory definitions of intent as mens rea do not apply); People v. R.V., 635 P.2d 892 (Colo. 1981) (same). When a term is not statutorily defined, it must be given its ordinary meaning. Marquez v. People, 2013 CO 58, ¶ 8, 311 P.3d 265, 268. Because, however, words frequently have more than one ordinary meaning,

---

[2] Prior to the 1975 amendments to the statutory culpable mental states in this jurisdiction, "intentionally" included an arguably objective alternative, encompassing actions that merely gave rise to a substantial certainty that any prohibited result would be produced. See People v. Childress, 2015 CO 65M, ¶ 24, 363 P.3d 155 at 162, as modified on denial of reh'g (Jan. 11, 2016).

or at least more than one shading or nuance of meaning, and because even a dictionary definition broad enough to encompass a particular sense of a word does not establish that the term is <u>ordinarily</u> understood in that sense, <u>Taniguchi v. Kan Pac. Saipan, Ltd.</u>, 132 S. Ct. 1997, 2003 (2012), the precise meaning actually intended by an undefined term often must be determined by reference to other considerations, like the context in which it is used, <u>Marquez</u>, ¶ 8, 311 P.3d at 268; <u>see also</u> <u>Jones</u>, ¶ 10, 346 P.3d at 48.

¶13    When the term "intended" is used in the passive voice or as a unit modifier, without reference to a particular subject by description or personal pronoun (e.g., "his") or prepositional phrase (e.g., "by him"), as it is here, it is just as naturally understood to convey an objective reference, as in "normally intended" or "reasonably intended." In determining the legislatively intended subject of the term "intended," as that term is used in the statutory definition of "deadly weapon," we have previously concluded that it must refer to the intent of the user of the weapon. <u>Montez v. People</u>, 2012 CO 6, ¶ 19, 269 P.3d 1228, 1232. We did so there, however, in express reliance on the syntax of the sentence in which the term appeared. <u>Id.</u> Where the weapon in question was modified by the phrase, "in the manner used or intended to be used," we reasoned that "in the manner used" on its face refers to the manner of use by the user, and in the absence of an express indication to the contrary, it would be unrealistic to conclude that the legislature intended that alternative phrase in the same sentence, "or intended to be used," could refer to a different subject, as for instance the designer or the manufacturer. <u>Id.</u>

¶14     In addition to syntax, a long-accepted convention of statutory interpretation dictates that a term with more than one meaning, or nuance of meaning, appearing in a series should be understood, in the absence of a contrary intention expressed by the enacting body, to have a meaning commensurate with or in the general nature of the things with which it has been grouped.  See, e.g., State v. Hartsough, 790 P.2d 836, 838 (Colo. 1990) (finding that the reference to "public hospitals" in the Colorado Governmental Immunity Act does not include veterinary hospitals largely for the reason that "[i]n that section public hospitals are grouped together with correctional facilities and jails, strongly suggesting that the section was intended to apply to public facilities designed to hold people").  See generally Sutherland Statutes & Statutory Construction, supra, § 47:16 (discussing the cannon of noscitur a sociis).  The terms "natural" and "probable" with which "intended" is grouped in describing a consequence of the particular use of force in question clearly do not refer to the subjective expectation or intent of the user of that force, but rather convey the notion of an objective likelihood that, in the absence of some intervening circumstance, a result will occur.

¶15     Nor does interpreting the subject of "intended" to be a normal, or typical, person, rather than the specific user of the force in question, have the effect of depriving the term of independent meaning or reading it out of the statute altogether, as the Vasquez court feared.  Apart from the fact that items appearing in a series often purposely overlap, as a means of ensuring complete coverage of the concept in question, from related but slightly different points of view or by different audiences, by

9

limiting the kind of force in question to force that would normally or typically be intended to produce death, the term "intended" still adds an important, and distinct, dimension to the definition of "deadly physical force." The addition of a limitation to force that a normal or typical person would use only if he intended to produce death ensures that even force the probable consequence of which would be to produce death, in the absence of some intervening event, would be excluded from the definition of "deadly physical force" if that consequence, despite being objectively probable, would nevertheless be counterintuitive.

¶16  Finally, as the extensive survey of other jurisdictions by the Vasquez court demonstrates, the Colorado Criminal Code is unusual, if not unique, in narrowly limiting the definition of "deadly physical force" to force that actually produces death. See 148 P.3d at 328–29 (surveying twenty-one jurisdictions, none of which require that the use of force actually cause death in order for the force used to be classified as deadly force). Similarly, a number of the jurisdictions cited in Vasquez as including in their definitions of deadly physical force some requirement of subjective intent or awareness on the part of the user actually require subjective intent or awareness only as an alternative to what the user "reasonably should have" known or what the likely consequence would be, rendering them effectively objective standards. See, e.g., Minn. Stat. § 609.066(1) (2016) ("'[D]eadly force' means force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm." (emphasis added)); Vt. Stat. Ann. tit. 13, § 3251(7) (2016) ("'Deadly force' means physical force which a person uses with the

10

intent of causing, or which the person knows <u>or should have known</u> would create a substantial risk of causing, death or serious bodily injury." (emphasis added)); <u>Commonwealth v. Noble</u>, 707 N.E.2d 819, 821 (Mass. 1999) ("[D]eadly force" is "force intended <u>or likely</u> to cause death or serious bodily harm." (emphasis added)); <u>Earl v. State</u>, 904 P.2d 1029, 1031 n.2 (Nev. 1995) (defining deadly force as force <u>likely or</u> intended to cause death or great bodily harm). Even the Model Penal Code approach, which the <u>Vasquez</u> court singles out as requiring a purely subjective state of mind, would not require that the user of the force intend to produce death, but merely that the user be aware of a substantial risk that the force actually used would do so. Model Penal Code § 3.11 (Am. Law Inst. 1985). Construing the term "intended" in its objective implication, as referring to the consequence that would normally or typically be intended, the definition of "deadly physical force" in this jurisdiction nevertheless remains among the most restrictive in the country. Defined objectively, as it is, the assessment whether or not physical force arguably used in self-defense constituted "deadly physical force" ceases to be a matter for the jury only where the credible evidence permits no other finding than that the physical force used by the defendant would normally be expected to, and in fact did, produce death.

¶17 While the threshold for entitlement to an instruction on an affirmative defense is low, it is not negligible. <u>See</u> <u>People v. Speer</u>, 255 P.3d 1115, 1119–20 (Colo. 2011). In this case there was no evidence from which the jury could have found that the defendant's use of physical force upon the victim was anything other than deadly physical force. By the defendant's own testimony and theory of the case, he shot the victim in the chest, at

close range, with a large caliber firearm. The physical force actually inflicted by the defendant upon the victim could not reasonably be characterized as anything other than force, the intended, natural, and probable consequence of which was to produce death, and there was no dispute that the victim died as the result of being shot in the chest by the defendant. Whether or not the defendant was entitled to a self-defense instruction at all, when the definition of "deadly physical force" is properly construed, he was clearly not entitled to a self-defense instruction premised on the use of any physical force other than deadly physical force.

## III.

¶18 Because the court of appeals misconstrued the definition of "deadly physical force," and when that statutory term is properly construed, the evidence at trial did not support an instruction on self-defense predicated on the use of other-than-"deadly" physical force, the judgment of the court of appeals is reversed, and the case is remanded for consideration of the defendant's remaining assignments of error.

**JUSTICE GABRIEL** dissents, and **JUSTICE HOOD** joins in the dissent.

JUSTICE GABRIEL, dissenting.

¶19     The majority implicitly concludes that the word "intended" in the definition of "deadly physical force," § 18-1-901(3)(d), C.R.S. (2016), is ambiguous.  The majority then defines the term "in its objective implication, as referring to the consequence that would normally or typically be intended."  Maj. op. ¶ 16.  In light of this construction, the majority concludes that the division below erred in construing "intended" as referring to the actor's subjective intent and in applying that definition to hold that Opana was entitled to an ordinary force self-defense instruction.  Id. at ¶¶ 17–18.

¶20     In my view, the definition of "deadly physical force" is clear and unambiguous, and the term "intended," as used therein, refers to the subjective intent of the actor who is asserting self-defense.  Even if the definition were ambiguous, however, I believe that the majority's construction is untenable because it impermissibly renders the term "intended" meaningless and mere surplusage.

¶21     Because I believe that the division below correctly construed the term "intended," and because I agree with the division that the trial court plainly erred in not giving an ordinary force self-defense instruction, see People v. Opana, No. 10CA1987, slip op. at 5–9 (Colo. App. May 29, 2014), I respectfully dissent.

## I.  Factual Background

¶22     Although the majority's brief recitation of the facts is accurate, see maj. op. ¶¶ 3–8, I do not believe that it fully captures what the evidence showed regarding the events at issue.

1

¶23    Opana, who suffers from problems with his balance due to the amputation of one of his feet and certain other disabilities, lived with the victim and another man in the other man's home. The evidence showed that the victim, whom Opana considered a friend, had a reputation for drinking and becoming violent when he drank, and Opana was aware of this reputation.

¶24    On the day in question, Opana, the victim, and the homeowner had spent the day drinking. This continued into the evening, when Opana and the homeowner sat on the porch drinking while the victim remained in the house drinking and listening to music.

¶25    At some point during the evening, Opana retrieved his jacket from his room. While there, he also grabbed a handgun, which he had only recently obtained, because he wanted to get used to carrying it around. In addition, at several times during the evening, the homeowner went into the house to turn down the victim's music. Each time, the victim would turn the music back up.

¶26    Thereafter, the victim left to buy more alcohol. At that point, Opana went inside and turned the music down. When the victim returned, however, he went to the porch and told Opana that he "shouldn't have turned that music down." He then went back inside.

¶27    A few minutes later, the victim re-emerged, made another comment about the music, and then hit Opana on the head, possibly with a hammer. The victim then started punching Opana and saying, "Yeah, nigga," as Opana, who, because of his

disabilities, could not fight back, tried to crawl away. Eventually, the victim stopped and went back inside.

¶28 Twenty minutes passed, and the victim returned and began punching Opana again. Opana again tried to get away, but the victim continued punching him, saying, "Yeah, nigga." The victim eventually stopped and went back inside.

¶29 Opana testified that he did not use his gun during these attacks because he did not feel that the victim would seriously injure or kill him. After the victim had left, however, Opana took out the gun and said to the homeowner, "[H]e just don't know how close he came."

¶30 Opana and the homeowner remained on the porch for another hour, when the homeowner went to bed and Opana went to a neighbor's house, still carrying his gun.

¶31 Opana returned some time later, having decided to move out. When he entered the house, he went to the room with the stereo and saw the victim sitting in a reclining chair. Opana told the victim of his plans to move and said that he would be out before noon the next day. At that point, the victim allegedly replied, "Yeah, nigga," slammed a beer on the table, and tried to stand up but fell back into the chair. The victim then tried to stand again, and Opana pulled out his gun. According to Opana, he feared that the victim was going to attack him again, and he pulled out the gun simply to "scare" the victim. Opana testified, however, that his disabilities caused him to lose his balance and that he accidentally pulled the trigger and shot his friend in the chest.

¶32 At trial, Opana introduced expert testimony to support his theory that the gun had discharged accidentally, and he maintained that he was attempting to use only ordinary physical force in self-defense.

## II. Analysis

¶33 I first address the applicable standard of review and principles of statutory construction. I then address what I believe to be the proper construction of the term "intended" as it is used in the statutory definition of "deadly physical force." § 18-1-901(3)(d). I conclude by explaining why I believe the trial court plainly erred in not giving an ordinary force self-defense instruction.

### A. Principles of Construction

¶34 We review issues of statutory construction de novo. Doubleday v. People, 2016 CO 3, ¶ 19, 364 P.3d 193, 196. Our primary purpose in statutory construction is to ascertain and give effect to the intent of the General Assembly. Id. We look first to the language of the statute, giving words and phrases their plain and ordinary meanings. Id. We read statutory words and phrases in context, and we construe them according to the rules of grammar and common usage. Id. In addition, we read the statutory scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts. Id. at ¶ 20, 364 P.3d at 196. We must avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results. Id.

¶35 If the statute is unambiguous, then we need not conduct any further statutory analysis. Id. If, however, the statute is ambiguous, then we may look to other interpretive aids to determine the legislature's intent. Lewis v. Taylor, 2016 CO 48, ¶ 20,

375 P.3d 1205, 1209. A statute is ambiguous when it is reasonably susceptible of multiple interpretations. See Hunsaker v. People, 2015 CO 46, ¶ 11, 351 P.3d 388, 391.

## B. Proper Meaning of "Intended"

¶36 "Deadly physical force" is defined as "force, the intended, natural, and probable consequence of which is to produce death, and which does, in fact, produce death." § 18-1-901(3)(d).

¶37 Although it does not say so directly, the majority implicitly concludes that the term "intended" as used in the foregoing definition is ambiguous. From that premise, the majority proceeds to conclude that "intended" should be given an "objective implication" and defines the term "as referring to the consequence that would normally or typically be intended." Maj. op. ¶ 16. For several reasons, I respectfully disagree with the majority's construction.

¶38 First, I perceive no ambiguity in section 18-1-901(3)(d). "Intend" is ordinarily defined to mean, "[t]o have in mind a fixed purpose to reach a desired object; to have as one's purpose." Intend, Black's Law Dictionary (10th ed. 2014); see also Intend, Webster's Third New Int'l Dictionary (2002) (defining "intend" to mean, "to have in mind as a design or purpose"); cf. § 18-1-501(5), C.R.S. (2016) (providing that a person acts "intentionally" or "with intent," for purposes of the culpable mental state requirement of certain offenses, "when his conscious objective is to cause the specific result proscribed by the statute defining the offense," and stating that "[i]t is immaterial to the issue of specific intent whether or not the result actually occurred").

5

¶39 By referring to what the actor has "in mind," the above-quoted definitions suggest that "intent" refers to the actor's subjective mental state. This fully comports with what I believe to be the plain and ordinary meaning of the word "intend."

¶40 Accordingly, I would construe "intended," as that term is used in section 18-1-901(3)(d), to refer to the subjective state of mind of the actor who is using the deadly physical force.

¶41 Second, as noted above, in interpreting a statute, we must read the statutory scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts and avoiding constructions that would render any words or phrases superfluous. Doubleday, ¶ 20, 364 P.3d at 196.

¶42 The majority defines "intended" to refer to "the consequence that would normally or typically be intended." Maj. op. ¶ 16. In my view, however, "the consequence that would normally or typically be intended" is simply another way of saying the "natural[] and probable consequence" of the action at issue. Accordingly, in defining "intended" as it does, the majority has effectively written the word "intended" out of the definition of "deadly physical force." Specifically, as noted above, "deadly physical force" is defined as "the intended, natural, and probable consequence" of the act at issue. § 18-1-901(3)(d). In my view, the conjunctive "and" requires that all three of these elements be satisfied: "intended," "natural," and "probable consequence." By defining "intended" as it has, the majority has essentially subsumed "intended" within the phrase "natural[] and probable consequence," rendering the term "intended"

6

meaningless, or at least superfluous. This we cannot do. <u>Doubleday</u>, ¶ 20, 364 P.3d at 196.

¶43   For these reasons, I would conclude that the term "intended," as used in section 18-1-901(3)(d), refers to the actor's (here, Opana's) subjective intent. Because it is undisputed that Opana's evidence tended to show that he lacked the requisite intent to kill the victim, I believe that the division below correctly concluded that Opana was entitled to an ordinary force self-defense instruction.

### C. Plain Error

¶44   The question for me thus becomes whether the trial court plainly erred when it did not give an ordinary force self-defense instruction. Like the division below, I believe that it did.

¶45   Plain error addresses error that is both obvious and substantial and that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. <u>People v. Miller</u>, 113 P.3d 743, 750 (Colo. 2005).

¶46   To qualify as plain error, an error must generally be so obvious that a trial judge should be able to avoid it without the benefit of an objection. <u>Scott v. People</u>, 2017 CO 16, ¶ 16, 390 P.3d 832, 835. For an error to be this obvious, the action challenged on appeal ordinarily "must contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law." <u>People v. Pollard</u>, 2013 COA 31M, ¶ 40, 307 P.3d 1124, 1133 (citations omitted); <u>see also</u> <u>People v. Ujaama</u>, 2012 COA 36, ¶ 42,

7

302 P.3d 296, 304–05 (noting that an error may be obvious when it has been decided by the Colorado Supreme Court or a division of the court of appeals).

¶47 Here, the precise question before us was decided years before Opana's trial by the division in People v. Vasquez, 148 P.3d 326, 329 (Colo. App. 2006). There, construing section 18-1-901(3)(d), the division stated:

> Unless we were to either eliminate, as surplusage, the word "intended" or construe the statute to include an additional word (i.e., "or") between "intended" and "natural," we would have to conclude that, in Colorado, an intent element is a necessary ingredient of "deadly physical force." We are not inclined either to strike or add a word to the legislature's definition.

Id.

¶48 The trial court here was aware of Vasquez and, indeed, specifically referenced it. Yet, the court did not apply it. In these circumstances, I believe that the error was obvious. See Ujaama, ¶ 42, 302 P.3d at 304–05.

¶49 I also believe that the error was substantial and that it so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. Because Opana did not use deadly physical force as defined in section 18-1-901(3)(d), and because the trial court did not give an ordinary force self-defense instruction, Opana was effectively deprived of his principal defense to the charges against him. Moreover, I cannot say that the evidence in this case was overwhelming. The evidence at trial, which was largely circumstantial, tended to show that the victim's death occurred after a day of drinking and after the victim had attacked the disabled Opana several times throughout the evening. In addition, Opana

8

consistently argued that when he shot the victim, he feared that the victim was going to attack him again, that he had pulled out his gun merely to "scare" the victim, and that he had accidentally pulled the trigger when he lost his balance. He also introduced expert testimony to support his theory that the gun, which he had only recently obtained, had discharged accidentally, killing his friend.

¶50 Accordingly, I would conclude, as did the division below, that the trial court plainly erred in not instructing the jury on ordinary force self-defense.

¶51 In reaching this conclusion, I am not persuaded by the People's argument that any error was not obvious because divisions of the court of appeals had split on the question now before us. In particular, the People argue that Vasquez created a division split between it and People v. Ferguson, 43 P.3d 705 (Colo. App. 2001). I perceive no such conflict.

¶52 In Ferguson, 43 P.3d at 709, the division concluded that the trial court had erred in giving a deadly physical force self-defense instruction when the victim had not, in fact, died. This error "allowed the jury to hold defendant to a more stringent standard in establishing self-defense than was required of him." Id.

¶53 In Vasquez, 148 P.3d at 330, in contrast, the division concluded that the trial court had erred in giving only a deadly force self-defense instruction when the victim had died but when the evidence supported an ordinary force self-defense instruction.

¶54 Accordingly, these cases presented different issues, and I perceive no conflict between them (nor, apparently, did the Vasquez division, which relied on Ferguson, see id. at 330).

9

### III. Conclusion

¶55    Because I believe that the division below correctly construed the term "intended," and because I agree with the division that the trial court plainly erred in not giving an ordinary force instruction, I would affirm the division's judgment. I thus respectfully dissent.

I am authorized to state that JUSTICE HOOD joins in this dissent.